# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Lofton*, 2011 IL App (1st) 100118

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GERALD LOFTON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1–10–0118 |
| Filed | June 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's dismissal of defendant's successive postconviction petition alleging his actual innocence was reversed based on an affidavit of his codefendant and the cause was remanded for a third-stage evidentiary hearing, since defendant made a substantial showing that the codefendant's affidavit exonerating defendant and implicating his codefendant was newly discovered evidence of defendant's actual innocence of first degree murder in a gang-related shooting, the evidence was material and not merely cumulative, and the evidence likely would change the result on retrial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 95–CR–11719; the Hon. Thomas Hennelly, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Jonathan Steffy, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE STERBA delivered the judgment of the court, with opinion.

Presiding Justice Lavin and Justice Salone concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Gerald Lofton was charged by indictment with two counts of first degree murder in the shooting death of Anthony Williams. Lofton's first trial resulted in a hung jury. Following a second jury trial, Lofton was found guilty of first degree murder. The circuit court sentenced Lofton to 50 years in prison. On direct appeal, this court affirmed the conviction (*People v. Lofton*, No. 1–97–3486 (1999) (unpublished order under Supreme Court Rule 23)). Lofton filed a *pro se* postconviction petition in July 2000. The circuit court's dismissal of this petition was affirmed by this court on September 19, 2002 (*People v. Lofton*, No. 1–00–2980 (2002) (unpublished order under Supreme Court Rule 23)). Lofton filed a second *pro se* postconviction petition on April 16, 2004. Lofton was appointed counsel, and a supplemental petition was filed on October 27, 2008. The circuit court granted the State's motion to dismiss the petition on December 18, 2009. On appeal, Lofton contends that the circuit court erred in granting the motion to dismiss where the petition contained a claim of actual innocence based on newly discovered evidence and the court erroneously applied the cause-and-prejudice test to this claim. For the reasons that follow, we reverse the judgment of the circuit court and remand for a third-stage evidentiary hearing.

¶ 2                                BACKGROUND

¶ 3    On March 20, 1995, Williams and his father, Carl Fisher, were walking south on Princeton Avenue in Chicago near 113th Street when they were attacked by a group of young men. Two shots were fired at Williams, killing him, and the group then scattered. Officer Kevin Williams and his partner were standing outside their squad car a short distance away and heard the shots. They then saw approximately 10 to 12 young men running from the direction where they heard the gunshots. Officer Williams went to the scene and saw Williams on the ground in a pool of blood. The only other person still in the area was Fisher. Officer Williams asked Fisher if he knew who had shot his son, and Fisher told him yes.

Fisher gave Officer Williams the name of "Little Anthony."

¶4        At a hearing on defense counsel's motion to suppress the arrest before Lofton's first trial, Officer Williams confirmed that on the police report he generated after the incident, he wrote that Williams was shot by Little Anthony. Officer Williams testified that he later discovered that Little Anthony went by the name of Antonio Fountain. Officer Williams said that Fisher did not mention Lofton. Officer Williams testified that he wrote "AKA Gerald Lofton" next to Fountain's name on the report because he later overheard Norman Moss, who was being questioned by police at the station in connection with the incident, tell another officer that Lofton was the shooter. Officer Williams said that he initially assumed that Lofton and Fountain were the same person.

¶5        At the second trial, Fisher testified that on March 20, 1995, his son was visiting him. At approximately 5 p.m., Fisher left his house with his son to walk him back to his own residence a few blocks away. They were walking southbound on Princeton and Fisher said that he heard someone coming up behind them. He turned and saw a group of four or five young men walking toward them at a fast pace. Fisher said that he knew his son was in a gang and he knew about the different gang territories, so he told his son that they were coming for him and to get out of there. Fisher recognized one of the young men in the group as someone he knew from the neighborhood as Little Anthony. The group attacked them and Fisher and Williams fought back. During the attack, Fisher was fighting with two of the young men and he stepped back and fell over the curb. As he was getting back up, he heard someone say, "Where is the nine, where is the nine?" Fisher said that he looked for his son and saw Lofton with a gun in his hand, hitting Williams with it. Fisher shouted, "No, don't do it!" He then heard two shots and the group scattered. Fisher saw Little Anthony running across the street with the gun in his hand. His son was on the sidewalk and he ran to him, but Williams was unresponsive. Fisher started shouting for help.

¶6        The police arrived and a short time later, some young men were brought to the scene in the back of a police car. Fisher identified Moss, who was in the police car, as one of the men who had attacked them. Fisher had initially given the police the name of Little Anthony and he later took the police to Little Anthony's mother's house. Fisher then went to the police station and was shown a book with some photos in it. He was subsequently asked by the detectives to view a lineup. Fisher said that at first he did not want to identify anyone in the lineup because he and his family lived in the neighborhood and he was afraid for his family's safety. He said that when he first viewed the lineup, he recognized Lofton as the person who shot his son but he did not say anything because he was afraid. The detectives had him view the lineup a second time and he identified Lofton as the person who shot his son.

¶7        On cross-examination, Fisher denied telling Officer Williams at the scene that Little Anthony was the person who shot his son. He acknowledged that Officer Williams asked him who shot his son, but he said that he did not tell Officer Williams who had done it, nor did he give him a description of the person at that time. He said that he did not describe the shooter at the scene as being a male black, 16 to 17 years old and about 5 feet 1 inch in height. He said that he later gave a similar description to the police of the shooter, but he said that the shooter was about his height, 5 feet 9 inches, or a little taller. Fisher was also asked if he knew the names of the two young men who were fighting with him. He responded that

he did not know at that time but learned later that Moss and an individual named Robert Foster were the ones who were attacking him.

¶ 8      Detective George Karl testified that he put together the lineup containing Lofton and brought Fisher in to view the lineup. Detective Karl said that as soon as Fisher looked at the lineup participants, he started shaking and crying. Detective Karl asked Fisher if he wanted to continue and Fisher said that he was scared to death. When asked if he knew anyone in the lineup, Fisher said he did, but he could not say because he was scared for himself and his family. Detective Karl then had Fisher step out of the lineup viewing area and waited until he calmed down. Detective Karl told Fisher that the police would protect his family and relocate them if necessary, and Fisher agreed to go back into the lineup room. As soon as they went back into the lineup viewing area, Fisher identified Lofton as the person who shot his son.

¶ 9      Detective Karl testified that on April 8, 1995, he took a number of photographs to Fisher and asked if he could identify anyone in the photos. Fisher identified Fountain as Little Anthony, the person who participated in the attack, struck his son, and ran off with the gun after the shooting. He also identified Flomont Johnson as someone he knew from the neighborhood, but he said that Johnson did not participate in the attack and he did not see him in the area at the time. He did not know the identity of anyone else in the photographs. One of the photographs was of Foster, and the remaining photographs were fillers.

¶ 10      Officer Davis testified that he and his partner were in the area at the time of the shooting and responded to a call of shots being fired. A description was given that several young men were running north on Princeton and that one was wearing a red jacket or coat. The officers proceeded down 112th Street and observed two young men running north from Princeton, one of whom was wearing a red coat. They stopped the two men, searched them, and took them to the crime scene. When they arrived at the scene, Officer Davis got out of the car to speak to his supervisor. Fisher ran over to the squad car, shouting that one of the individuals in the back of the car was at the scene, and tried to get into the car to go after the individual. Officer Davis later learned that the person Fisher was trying to get to was Moss. The person in the car who was wearing the red jacket was identified as Jerry Singleton. Officer Davis acknowledged that Fisher did not have any problem identifying Moss as someone who had been involved in the attack.

¶ 11      Officer Williams testified that he was on foot in the area of 113th and Wentworth when he heard gunshots. He looked toward 113th and Princeton and saw 10 to 12 youths running north on Princeton. He got in his squad car and drove to the scene. He had to restrain Fisher, who was very distraught and was trying to move his son's body. He spoke with Fisher, who told him that he had seen what had happened and provided the name and description of Little Anthony. On cross-examination, Officer Williams acknowledged that in a previous proceeding, he testified that Fisher told him that Little Anthony was the one who shot his son. Officer Williams said that he made a mistake in his previous testimony. He further acknowledged that his report from the incident indicates that Fisher told him he saw Little Anthony shoot his son, but Officer Williams said that Fisher did not actually tell him that. He said that Fisher was very distraught and only gave him one name, so he made the assumption that Little Anthony was the shooter and that is why he put that in the report.

Officer Williams testified that Fisher had given him a description of the shooter as a male black between the ages of 16 and 17, 5 feet 1 inch in height. However, on redirect and recross, Officer Williams said that Fisher had actually given him a description of Little Anthony, and he just assumed Little Anthony was the shooter. Defense counsel again referred to his testimony in a previous proceeding in which he said that Fisher had given him a description of the shooter. Officer Williams said that he made a mistake in his previous testimony.

¶ 12    Over defense counsel's objection, Foster was called to testify. Foster was originally charged as a codefendant in the case but had been acquitted by the time of Lofton's second trial. Foster testified that at the time of the shooting, he, Lofton, Johnson, Moss, and Little Anthony, a/k/a Fountain, were all members of the Blackstones street gang and Singleton was a member of the Micky Cobras. Foster said that on the date of the shooting, he was in Johnson's car and saw a group of individuals going toward 113th on Princeton. Foster said he could not identify anyone in the group because there were too many people and he did not know if Lofton was in the group. Foster was then asked about a statement he had given to the assistant State's Attorney after the shooting in which he said that two more people were in Johnson's car with him, Moss and Lofton pulled up in another car, Moss told Johnson there was someone on the corner, and Moss asked Johnson if he wanted to "push on" this person (*i.e.*, beat him up). Foster acknowledged that he told the assistant State's Attorney the details that were in the statement and that he signed the statement, but he said that it was because he was told that if he did not tell them anything about the case, they were going to charge him with first degree murder. Foster testified that the detectives questioned him three times after he was arrested. He said that the first two times, he told them he did not know anything about the incident. The third time, a detective told him he was going to be charged with first degree murder if he did not give a statement, so that is when he agreed to give the statement. Foster maintained that the statement he gave the detectives was not true.

¶ 13    Foster's statement was read to the jury during the testimony of the assistant State's Attorney who took the statement. In his statement, Foster said that on the day of the shooting, he, Kenny Sharkey and Fountain were all in a car driven by Johnson that was stopped at 112th and Princeton. Moss and Lofton pulled up in another car. Moss told Johnson there was a guy on the corner and asked if they wanted to beat him up. Johnson then asked if he should go get the gun, and Lofton said yes. Foster saw Johnson get out of the car and walk into his mother's house, exit the house, and hand a 9-millimeter automatic handgun to Lofton. Everyone got out of the cars and started walking on Princeton. Foster said he was about 20 yards away from Williams and saw Moss, Lofton, Fountain, Johnson, Singleton and Sharkey start punching Williams in the face and body. Foster said that he saw Lofton pull out the gun and shoot Williams.

¶ 14    After Foster's statement was published in its entirety, defense counsel moved for a mistrial. Defense counsel's earlier objection to Foster's testimony was on the ground that in the first trial, the court granted a motion *in limine* to exclude the statements of all codefendants. Because Foster had been acquitted the week before Lofton's second trial began, he was no longer a codefendant and the court overruled the objection and allowed him to testify. In the motion for a mistrial, defense counsel renewed the objection to Foster being

allowed to testify at all and objected to the publication of Foster's statement. The court denied the motion.

¶ 15   The defense called Betty White, Lofton's mother, to testify. She testified that the police came to her home after the incident and said they wanted to question her son about an altercation. Her son was not home at the time. The police saw pictures of her son on the mantle and asked if they could have one of them, so she gave them a photograph. Lofton then testified that he was 20 years old on March 20, 1995, and was 5 feet 11 inches tall. Lofton said that on March 20, he and a friend attended a class together at Kennedy King College from 11 a.m. to 1 p.m. After class, they went to the Evergreen Plaza shopping mall. They left the mall around 3:30 or 4 p.m. and Lofton drove his friend to his friend's mother's house, where he sat and talked for about half an hour before going home. He then walked to a store on the corner to get something to eat and saw Dorian Hart, his dog trainer, talking on the pay phone inside the store. Lofton had been out of town the previous weekend and Hart had been keeping his dog, so Lofton asked Hart to return his dog. Hart told him that the dog was at the home of his ex-girlfriend, Deidra Dennis, so the two of them drove to her house to get the dog.

¶ 16   Lofton and Hart left with the dog around 6 p.m. and returned to Lofton's house to drop the dog off. The two then drove to visit a friend. After leaving the friend's house, they went to a store on 120th and Michigan to buy some beer, and while they were in the store, the police came in and told everyone to go outside and put their hands on the police car. The police asked everyone for their names, and when Lofton told them his name, the police handcuffed him. They also handcuffed Hart and took them both to the police station. He and Hart were both ordered to participate in a lineup. An officer told them that nobody had been picked out of the first lineup. They had a second lineup, and Lofton did not find out that he had been picked out of the lineup until they brought him to Cook County jail.

¶ 17   On cross-examination, Lofton was asked whether Hart was in court that day and he said no, Hart had to watch his children. The court would not allow defense counsel to ask whether Hart had testified on Lofton's behalf at the first trial, but Lofton said that he had asked Hart to testify for him at his second trial. Lofton testified that he was not a member of any gang in 1995. He said that he got out of the Blackstones gang after he graduated from high school in 1993 and went away to college. Lofton testified that on March 20, 1995, he was not involved in any shooting and was not at the scene when Williams was killed.

¶ 18   Because of Foster's statement that Johnson was involved in the attack, defense counsel wanted to recall Fisher, but he lived in another state at that time. Instead, the parties stipulated that if Fisher was recalled as a witness, he would testify that he knew Johnson from the neighborhood, but he did not see Johnson on the street during the attack.

¶ 19   The jury returned a verdict of guilty of first degree murder. As previously noted, Lofton's conviction was affirmed on direct appeal (*People v. Lofton*, No. 1–97–3486 (1999) (unpublished order under Supreme Court Rule 23)). Lofton filed a *pro se* postconviction petition in July 2000, alleging ineffective assistance of counsel on the grounds that defense counsel failed to call Dennis and Hart as alibi witnesses at the second trial. The circuit court's dismissal of this petition was affirmed by this court on September 19, 2002 (*People*

*v. Lofton*, No. 1–00–2980 (2002) (unpublished order under Supreme Court Rule 23)), in part because Lofton failed to attach affidavits from the two alibi witnesses.

¶ 20    Lofton filed a second *pro se* postconviction petition on April 16, 2004. Lofton was appointed counsel, and a supplemental petition was filed on October 27, 2008. The petition again alleged ineffective assistance and this time included an affidavit from Hart. Hart's affidavit stated that he testified as an alibi witness at Lofton's first trial. Hart said that on March 20, 1995, he saw Lofton at the store at approximately 3:45 to 4 p.m. He stated that he was in the process of training Lofton's dog and had boarded him at Dennis's home the weekend before March 20. He left the restaurant with Lofton to go get Lofton's dog. They arrived at Dennis's home around 4:30 p.m., but she was not home. They waited in the car for 30 minutes. When she returned home, they let the dog run in the backyard for a few minutes, and then left her home between 5 and 5:30 p.m. Hart did not remember when they dropped off a friend of Lofton's who was riding with them, or when they dropped off the dog. They stopped to visit another friend for about 10 minutes and then Lofton drove Hart to his mother's house to pick up some training equipment. Lofton then drove Hart to a store on 120th and Michigan. When Hart came out of the store, the police had people lined up on the fence and Lofton was in the police car. He attempted to retrieve his equipment from Lofton's car, and the police then arrested him. Hart was released later that evening. Hart stated that he informed defense counsel immediately after the mistrial that he would testify again at Lofton's second trial. However, he stated that defense counsel did not subpoena him for the second trial and did not notify him of the date or time of the trial. Hart stated that he would have been willing to testify at Lofton's second trial.

¶ 21    The second postconviction petition also alleged actual innocence on the basis of an affidavit provided by Antonio Walker, a/k/a Antonio Fountain. Walker stated that on March 20, 1995, he and Moss were in Moss's car when they saw Fisher and Williams on the corner of 113th and Princeton. They drove to a store on 113th and Wentworth, where they saw Sharkey, Singleton and Johnson. They told them there was a "brick" on the corner. "Brick" was a slang word used for rival gang members. Walker got out of Moss's car and Moss said he would meet them at 113th and Princeton. Walker, Johnson, Sharkey and Singleton walked to Johnson's grandmother's house on 112th Street, where Johnson retrieved a 9-millimeter handgun and handed it to Walker. Johnson then got in his car and Walker, Sharkey and Singleton walked south on Princeton toward 113th Street. As the group approached Fisher and Williams, Moss and Foster came down 113th and joined them. Johnson drove up alone and remained in his car.

¶ 22    Walker said "G.D." (for Gangster Disciple) to Williams to see what his reaction would be, but Williams did not respond. Walker then hit Williams in the face. Singleton joined Walker in attacking Williams, while Sharkey, Moss and Foster attacked Fisher. Walker stated that it looked like Williams was reaching for a weapon and Singleton shouted, "Where's the nine?" Walker then pulled out the gun and shot Williams twice. Foster and Sharkey jumped in Johnson's car and Johnson drove off. Singleton, Moss and Walker ran north on Princeton, but because Walker still had the gun, they split up with Singleton and Moss running down 112th toward Wentworth and Walker continuing on Princeton.

¶ 23    Walker stated that Lofton was nowhere around at the time of the incident. In 1995,

Walker went by the name of Antonio Fountain. Under the name of Fountain, he said that he signed a statement implicating Lofton, because the statement did not implicate Walker himself and he thought if he signed it, he would not be charged with the crime. He was still charged with the murder of Williams under the name of Fountain and went through two trials before he was found not guilty. Walker stated that he did not admit to the shooting then because he did not want to implicate himself. He said that after he was found not guilty, he did not have any contact with Lofton or his attorney, and the trial attorney never attempted to contact him. Walker finally located Lofton and said he is now willing to state the facts because an innocent man is in prison.

¶ 24    On December 18, 2009, the court issued its ruling on the second postconviction petition. The court stated that the petitioner needed leave of court to file a second petition, and therefore, the cause-and-prejudice test applied. The court stated that the petitioner had not met his burden of cause and prejudice. The court said that it did not believe that an actual innocence claim, which would excuse the cause-and-prejudice standard, was present because the claim was based on an affidavit of a codefendant who was exonerated and made a prior statement, executed 10 years after the fact. Thus, the court granted the State's motion to dismiss the petition. Lofton timely filed this appeal.

¶ 25                              ANALYSIS

¶ 26    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122–1 *et seq.* (West 2004)) provides a procedural mechanism by which any person imprisoned in the penitentiary may assert that there was a substantial denial of a federal or state constitutional right in the proceeding which resulted in his or her conviction. 725 ILCS 5/122–1(a) (West 2004); *People v. Harris*, 224 Ill. 2d 115, 124 (2007). Proceedings are commenced by the filing of a petition, verified by affidavit, in the circuit court in which the conviction took place. 725 ILCS 5/122–1(b) (West 2004). A postconviction proceeding is limited to constitutional issues that have not been, nor could they have been, previously adjudicated. *Harris*, 224 Ill. 2d at 124.

¶ 27    Postconviction proceedings may consist of up to three stages in cases that do not involve the death penalty. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006). At the first stage, the circuit court reviews the petition to determine whether the petition is frivolous and patently without merit. *Harris*, 224 Ill. 2d at 125-26. A petition must present "the gist of a constitutional claim" to survive beyond the first stage. *Id*. at 126. The circuit court is required to dismiss petitions that are frivolous and patently without merit, and such dismissals are final orders. *Id*. At stage two, the circuit court may appoint counsel for the defendant and the State may move to dismiss the petition. *Id*. At the second stage, the relevant inquiry is whether the petition establishes a substantial showing of a constitutional violation. *Id*. (citing 725 ILCS 5/122–6 (West 2004)). A petition that is not dismissed at the second stage proceeds to the third stage, where the circuit court conducts an evidentiary hearing. *Id*.

¶ 28    At both the second and third stages of postconviction proceedings, the defendant bears the burden of making a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. At the second stage of the proceedings, all well-pleaded facts that are not positively rebutted by the trial record are taken as true. *Id*. The circuit court does not engage

in fact-finding or credibility determinations at the dismissal stage; rather, such determinations are made at the evidentiary stage. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). Here, Lofton's petition was dismissed at the second stage. We review a circuit court's dismissal of a postconviction petition at the second stage *de novo*. *Pendleton*, 223 Ill. 2d at 473.

¶ 29 Lofton argues that the circuit court erred in granting the State's motion to dismiss on the grounds that his actual innocence claim did not satisfy the cause-and-prejudice standard, because successive petitions claiming actual innocence are not subject to this test. The State concedes that the circuit court erred in utilizing the cause-and-prejudice standard in dismissing petitioner's successive petition, but contends that this court can affirm on any basis supported by the record. The State argues that Walker's affidavit was not newly discovered evidence because Walker was acquitted before the start of Lofton's second trial and, thus, Walker's potential testimony was available at the time of Lofton's trial. The State further contends that Walker's affidavit would not change the result in a retrial because of Fisher's testimony that Lofton was the shooter and Foster's pretrial statement in which he said that Lofton was the shooter.

¶ 30 The filing of successive postconviction petitions has generated a fair amount of confusion in the lower courts. Our supreme court attempted to clarify the issues surrounding successive postconviction petitions in *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). The Act generally contemplates the filing of only one postconviction petition. 725 ILCS 5/122–3 (West 2004); *Pitsonbarger*, 205 Ill. 2d at 456; *People v. Morgan*, 212 Ill. 2d 148, 153 (2004). However, our supreme court held in *Pitsonbarger* that fundamental fairness allows the filing of a successive petition where the petition complies with the cause-and-prejudice test. *Pitsonbarger*, 205 Ill. 2d at 459. The court stated that " 'cause' in this context refers to any objective factor, external to the defense, which impeded the petitioner's ability to raise a specific claim in the initial post-conviction proceeding." *Id*. at 462. The court also noted that the cause-and-prejudice test is to be applied to individual claims, not to the petition as a whole. *Id*. " 'Prejudice' exists where the defendant can show that the claimed constitutional error so infected his trial that the resulting conviction violated due process." *Morgan*, 212 Ill. 2d at 154. In 2004, our legislature amended the Act to adopt the cause-and-prejudice test. 725 ILCS 5/122–1(f) (West 2004); *People v. Anderson*, 375 Ill. App. 3d 121, 135 (2006).

¶ 31 In *Pitsonbarger*, the supreme court reaffirmed that even if a petitioner cannot show cause and prejudice, the failure to raise a claim in an earlier petition will be excused if necessary to prevent a fundamental miscarriage of justice. *Pitsonbarger*, 205 Ill. 2d at 459. The supreme court reiterated this principle in *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009), stating that in a case not involving the death penalty where a defendant sets forth a claim of actual innocence, the defendant is excused from showing cause and prejudice. We note that a determination of whether or not the cause-and-prejudice test applies and, if it applies, whether or not the test is satisfied, is merely a determination of whether a claim raised in a successive petition may be considered on its merits. See *Pitsonbarger*, 205 Ill. 2d at 459. Thus, if the cause-and-prejudice test applies and is not satisfied, the claim is statutorily barred and the merits of the claim will not be considered.

¶ 32 We now turn to Lofton's argument that the circuit court erred in using the cause-and-

prejudice standard when it dismissed Lofton's second postconviction petition. In fact, both parties agree that the application of this standard was erroneous. In its ruling, after finding that Lofton had "[not] met his burden of cause and prejudice," the circuit court acknowledged that a claim of actual innocence was an exception to the cause-and-prejudice standard, but it said it did not believe an actual innocence claim was present here. The circuit court reasoned that Walker's affidavit did not support a claim of actual innocence because Walker was a codefendant who was exonerated at trial, made a prior statement, and executed the affidavit 10 years after the fact. The State argues that this reasoning demonstrates that although the circuit court erroneously applied the cause-and-prejudice test, it was in fact determining whether petitioner made a substantial showing of actual innocence.

¶ 33    In fact, Lofton's petition included a claim of actual innocence. The circuit court appears to have determined that, on its face, this was not a *bona fide* claim of actual innocence, and therefore, the cause-and-prejudice test applied. Although our supreme court has definitively stated that a claim of actual innocence excuses the defendant from showing cause and prejudice in order to reach the merits of a successive postconviction petition, there is indeed a lack of clarity in the existing jurisprudence regarding what analysis should be used in determining whether a claim purporting to be an actual innocence claim does, in fact, allege actual innocence. This court held in *People v. English*, 403 Ill. App. 3d 121, 132 (2010), that a defendant was not excused from showing cause and prejudice where his actual innocence claim was merely a reiteration of his previous ineffective assistance of counsel claim. We agree that, as in *English*, there are instances in which a purported claim of actual innocence is, on its face, obviously not an actual innocence claim. However, in the case at bar, Lofton's claim of actual innocence is based on an affidavit of someone purporting to be the actual shooter stating that Lofton was not at the scene, a statement that is consistent with what Lofton has maintained since his arrest. Thus, we conclude that the petition contains a legitimate claim of actual innocence, and thus, this claim is not subject to the cause-and-prejudice test.

¶ 34    We note that this determination merely means that the successive petition is not statutorily barred and the merits of the actual innocence claim will be considered. As previously stated, a petitioner at the second stage of postconviction proceedings must make a substantial showing of a constitutional violation. *Harris*, 224 Ill. 2d at 126. In *Ortiz*, our supreme court stated that evidence in support of a claim of actual innocence "must be newly discovered; material and not merely cumulative; and 'of such conclusive character that it would probably change the result on retrial.' " *Ortiz*, 235 Ill. 2d at 333 (quoting *People v. Morgan*, 212 Ill. 2d 148, 154 (2004)). We note that in *Ortiz*, the supreme court was considering whether the circuit court's ruling following a third-stage evidentiary hearing was manifestly erroneous. *Id.* Thus, the court had to determine whether the petitioner had, in fact, shown actual innocence such that a new trial was warranted. However, at the second stage of postconviction proceedings, the relevant inquiry is whether the petitioner has made a substantial showing of actual innocence such that an evidentiary hearing is warranted.

¶ 35    Although a defendant is not entitled to an evidentiary hearing as a matter of right, our supreme court has repeatedly stressed that a hearing is required whenever the petitioner makes a substantial showing of a violation of constitutional rights. *Coleman*, 183 Ill. 2d at

381 (and cases cited therein). Dismissal of a postconviction petition is warranted only when the petition's allegations of fact, liberally construed in favor of the petitioner and in light of the original trial record, fail to make a substantial showing of imprisonment in violation of the state or federal constitution. *Id.* at 382.

¶ 36　　Reiteratively, after stating that the exception to the cause-and-prejudice standard was not present in this case, the circuit court explained that it did not agree that Walker's affidavit supported a claim of actual innocence. The reasoning the court gave for this conclusion is that Walker was a codefendant who was exonerated at trial, made a prior statement, and executed the affidavit 10 years after the fact. This appears to be a dismissal of Walker's affidavit, and thus, of Lofton's actual innocence claim, on the basis of a credibility determination, which, as previously noted, is an issue to be reached at the evidentiary stage, not at a second-stage dismissal hearing. *Id.* at 385.

¶ 37　　We must now determine whether Lofton's petition made a substantial showing that the evidence upon which his actual innocence claim was based was newly discovered, material and not merely cumulative, and likely to change the result on retrial. We first address the requirement that the evidence must be newly discovered. Evidence that is newly discovered is defined as evidence that was discovered since the trial and could not have been discovered earlier through due diligence. *Ortiz*, 235 Ill. 2d at 334. Taking the facts alleged in the petition as true, Walker's admission that he was the shooter and that Lofton was not at the scene was not discovered until Walker contacted Lofton and subsequently signed the affidavit on December 10, 2007. Prior to the contact from Walker, there would have been no reason for Lofton to seek Walker out. Lofton has maintained from the beginning that he was not at the scene and, thus, would not have known that Walker was the actual shooter. Accordingly, the only information available to Lofton prior to his second trial would have been that Walker had been identified by Fisher and charged with the murder, but had been acquitted. Under this scenario, absent Walker coming forward with a different story, there would be no way that Lofton could have known that Walker was the shooter and that he would sign an affidavit to that effect. Therefore, Lofton has made a substantial showing that the evidence was newly discovered. Why Walker came forward when he did is a matter to be investigated at an evidentiary hearing, not at this stage in the proceedings.

¶ 38　　The second requirement is that the evidence be material and not merely cumulative. Evidence is considered cumulative when it does not add anything to what was previously before the jury. *Id.* at 335. Taking the facts alleged in the petition as true, the evidence that someone else was the shooter and Lofton was not present is certainly material. This evidence also certainly adds something to what was previously before the jury. The jury learned of the initial police report in which Walker was identified as the shooter, had the testimony of Officer Williams that he made a mistake and just assumed Walker was the shooter, the testimony of Fisher that Walker ran away from the scene with the gun but that Lofton was the shooter, and the testimony of Foster that he did not know if Lofton was there after making an initial pretrial statement that Lofton was, in fact, the shooter. The jury also had Lofton's testimony that he was not there, but no supporting statements from alibi witnesses.

¶ 39　　In contrast, the petition included an affidavit from one of the alibi witnesses at the first trial, stating that he would have again verified Lofton's account if he had been called as a

-11-

witness at the second trial, and an affidavit from a codefendant who did not testify and whose statement was not before the jury, stating that he was the actual shooter and Lofton was not there. The record supports these facts to the extent that Walker is the only one who was immediately named and described at the scene by Fisher, and Fisher consistently maintained that he saw Walker running from the scene with the gun. Thus, Lofton has made a substantial showing that the evidence is material and not merely cumulative, and Walker's credibility is an issue to be determined at the evidentiary stage.

¶ 40      Finally, the evidence must be so conclusive that it would probably change the result on retrial. The State correctly notes that "the hallmark of 'actual innocence' means 'total vindication,' or 'exoneration.' " *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008). It would not have been enough for Walker to state that he was the shooter if Lofton was still actively involved under Walker's version of events. However, Walker's affidavit states that not only was Walker the shooter, Lofton was not even there. This is inconsistent with Fisher's identification of Lofton as the shooter in a lineup and with Foster's initial pretrial statement that Lofton was the shooter. However, it is consistent with Lofton's insistence from the beginning, supported by alibi witnesses, that he was not present at the scene. It is also consistent with Fisher's apparent initial identification of Walker and his testimony that Walker is the one he saw running from the scene with the gun. Moreover, Walker's account in which Johnson was a participant but drove up in his car alone and stayed in the car is consistent with the testimony of Fisher, who knew Johnson, but maintained he was not at the scene. We also note that although Fisher identified Lofton in a lineup and testified that he gave a physical description of Lofton to the police at some point during the investigation, Fisher's initial identifications and descriptions were only of Walker and Moss. Officer Williams asked Fisher if he knew who shot his son and Fisher said yes, but the only name he provided initially was Walker's. Testimony reflects that the police report does not indicate that Fisher ever spoke of a separate shooter initially or described Lofton to police, and although this testimony was not before the jury, Officer Williams stated that he got Lofton's name from an interview he overheard at the station of Moss, who was apprehended fleeing the scene and was immediately identified by Fisher as a participant. Fisher also consistently maintained that Walker was the one who fled the scene with the gun. Thus, Lofton has made a substantial showing that the evidence would probably change the result on retrial and again, Walker's credibility is something that must be determined at the evidentiary stage, not the dismissal stage. For these reasons, we hold that Lofton has made a substantial showing of a constitutional violation and is entitled to a third-stage evidentiary hearing on his claim of actual innocence. We reverse the circuit court's dismissal of the petition and remand for a third-stage evidentiary hearing.

¶ 41      Reversed and remanded.