2022 IL App (1st) 200633-U

FIFTH DIVISION
June 30, 2022

No. 1-20-0633

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 27586 |
| | ) | |
| LORENZO EVANS, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Connors concurred in the judgment.

ORDER

¶ 1    *Held*:  The trial court did not err by dismissing the defendant's postconviction petition after a third stage evidentiary hearing.

¶ 2    On May 25, 2007, following a jury trial, the defendant-appellant, Lorenzo Evans, was convicted of first-degree murder and sentenced to 45 years' imprisonment. On direct appeal, this court affirmed Mr. Evans' conviction and sentence. Mr. Evans subsequently filed a motion for leave to file a successive postconviction petition, claiming actual innocence. The circuit court of Cook County allowed it to proceed to a third-stage evidentiary hearing. On November 26, 2019,

following the evidentiary hearing, the circuit court denied the successive postconviction petition and Mr. Evans' appealed the court's ruling on the same day. On appeal, Mr. Evans argues that the trial court erred by denying his successive postconviction petition alleging actual innocence. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                              BACKGROUND

¶ 4      In December 2003, Mr. Evans was charged with the first-degree murder of Marcus Galloway, and a jury trial was held in May 2007, during which several witnesses testified. Sheila Young testified for the State that on October 15, 2003, at approximately 2:30 p.m., she was selling drugs on West Maypole Avenue, just west of Cicero Avenue, in Chicago. Minutes earlier, Ms. Young had spoken to Mr. Evans, who was standing by a gangway of an abandoned building on the 4700 block of West Maypole Avenue, on the east side of Cicero Avenue. At approximately 2:45 p.m., while Ms. Young was standing on West Maypole Avenue on the west side of Cicero Avenue, she heard four to six gunshots from the 4700 block of West Maypole Avenue. As Ms. Young looked east, she saw Mr. Evans with a handgun and smoke coming out of his hand as he chased Mr. Galloway from the north to the south side of West Maypole Avenue. Mr. Evans was approximately six feet behind Mr. Galloway during the chase. An unidentified man also followed behind Mr. Evans. Ms. Young stated that Brian Weston was also present at the scene but did not follow Mr. Evans as the group ran. Ms. Young testified that she was about 55 to 60 feet away when she observed the shooting and Mr. Evans was the only person who had a weapon. She testified that she eventually lost sight of the men when they ran between some parked cars. Moments later, Mr. Evans rejoined Mr. Weston on West Maypole Avenue, and both men headed along Cicero Avenue towards Fulton Street. After the shooting, Ms. Young walked to the 4700 block of West Maypole Avenue and observed Mr. Galloway lying face down on the ground. By that time, the

three other men were no longer in sight, and a crowd had gathered near Mr. Galloway. However, she did not stay at the scene to speak with the police about the crime at that time because she had drugs in her possession.

¶ 5     On cross-examination, Ms. Young stated that on October 21, 2003, she spoke with the police regarding the shooting and positively identified Mr. Evans in a photograph array as the shooter. At the time of trial, Ms. Young was incarcerated for an unrelated drug case and had been convicted of five felonies. However, she denied that any promises were made to her in exchange for her testimony. Although Ms. Young was a drug addict on the day of the shooting, she testified that she was not under the influence of drugs at that time of the incident.

¶ 6     Christopher Glover also testified on behalf of the State. At the time of trial, Mr. Glover was incarcerated for an unrelated case and had prior drug and retail theft convictions. He testified that on October 15, 2003, prior to 3 p.m., he arrived home and parked his car directly in front of his house at 4736 West Maypole Avenue. He noticed Mr. Evans, Mr. Galloway, Mr. Weston, and a man named "Sneed" "shooting dice" on the front porch of an abandoned house located next to Mr. Glover's home. Mr. Glover noticed that Mr. Galloway had money in his hand and that the four men were "talking smack" to each other. Mr. Glover then entered his home and walked about 15 to 20 steps to the back of the house, at which time he heard a big boom. He ran to the front window of his home and saw Mr. Galloway running to the south side of West Maypole Avenue while being chased by Mr. Evans, who had a gun in his left hand at waist level. Mr. Glover heard multiple rapid gunshots during the chase and saw Mr. Evans shooting at Mr. Galloway. Mr. Galloway then fell on the south side of the street, after which Mr. Evans and Mr. Weston ran through a gangway separating the abandoned building and Mr. Glover's house. Mr. Glover saw Ms. Young at the crime scene after the shooting occurred. At the crime scene, Mr. Glover told police officers that

he did not know or see anything. However, later that night at a police station, Mr. Glover identified Mr. Evans, Mr. Weston, and Mr. Galloway as three of the men who were present at the crime scene. In Mr. Glover's October 22, 2003, written statement and in his testimony to the grand jury, he stated that he did not see a gun in Mr. Evans' hand during the shooting. Similarly, the written statement and his grand jury testimony stated that he heard a loud boom, followed by three to four gunshots, and that Mr. Evans ran through the gangway alone after the shooting. At trial, Mr. Glover explained that the reason he initially denied having any knowledge of the crime and denied seeing a gun in Mr. Evans' hand was because he did not want to get involved as a witness.

¶ 7    Clarence Cage, who was incarcerated for possession of a controlled substance at the time of Mr. Evans' trial and had prior drug convictions, testified on behalf of the State. On October 15, 2003, shortly before 3 p.m., Mr. Cage walked from his home at 4708 West Maypole Avenue to a store located on Cicero Avenue and Lake Street. Enroute to the store, Mr. Cage passed the abandoned house at 4738 West Maypole Avenue, where he saw Mr. Evans, Mr. Galloway, and Mr. Weston "shooting dice." Mr. Cage did not recall seeing a fourth man on the porch of the abandoned house. On the way home from the store, Mr. Cage again passed the abandoned home and noticed that the three men were still engaged in a dice game. When he reached his home and went upstairs, he heard gunfire. When the gunfire ceased, Mr. Cage observed a person lying on the grass and sidewalk on the south side of West Maypole Avenue. Subsequently, Mr. Cage called the police and approached the victim, whom he recognized as Mr. Galloway. Mr. Galloway had blood-stained money in his hand, which Mr. Cage retrieved for safekeeping until the police arrived because he did not want the money to be stolen. Mr. Cage later accompanied Detective Kevin Bor to the police station, where he identified Mr. Evans and Mr. Weston in a photographic array. He later made a written statement regarding the shooting and testified before a grand jury.

¶ 8    Cook County Deputy Chief Medical Examiner Dr. Mitra Kalekar testified as to Mr. Galloway's autopsy. Based on the autopsy, Mr. Galloway suffered multiple gunshot wounds to his body, including his chest, thighs, and left hand. One bullet in particular, which was recovered from the right side of Mr. Galloway's chest, had entered from the central chest area and traveled through his heart, right lung, diaphragm, and liver. Dr. Kalekar opined that it was possible to sustain a gunshot wound to the chest if the victim, who was being chased, had turned to look behind at his shooter. The gunshot wounds to Mr. Galloway's chest and thighs indicated that the bullets that caused those wounds had traveled from the front to the back of his body. Mr. Galloway also had abrasions on the left side of his face, which was consistent with his falling on his face after being shot. Dr. Kalekar testified that there was no evidence of close-range firing, which indicated that the shots were fired from a distance of two feet or more. Cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 9    By stipulations, the parties agreed that the distance from a light pole on the northwest corner of Cicero Avenue at West Maypole Avenue to the wrought iron gate of the abandoned house at 4738 West Maypole Avenue was approximately 274 feet. The parties also stipulated that the distance from the wrought iron gate of the abandoned house diagonally across to the sidewalk at 4727 West Maypole Avenue was approximately 155 feet.

¶ 10    Mr. Evans elected not to testify. Following closing arguments, the jury found Mr. Evans guilty of first-degree murder. Mr. Evans was later sentenced to 45 years of imprisonment, which included a 20-year sentence for personally discharging the firearm that killed Mr. Galloway. On November 10, 2009, this court affirmed Mr. Evans' conviction and sentence on direct appeal. See *People v. Evans,* No. 1-07-2888 (2009) (unpublished order under Supreme Court Rule 23.)

¶ 11    On April 20, 2010, Mr. Evans filed a *pro se* postconviction petition, alleging ineffective assistance of counsel for failing to call Mr. Weston as a witness. Mr. Weston, in the attached affidavit, stated that he was with Mr. Evans and Mr. Galloway on the day of the murder and that Mr. Evans did not kill Mr. Galloway. The petition was summarily dismissed. Mr. Evans appealed the decision and on December 31, 2014, this court reversed the trial court's decision and allowed Mr. Evans to proceed to the second stage of the postconviction proceedings and to be represented by counsel. See *People v. Evans*, 2014 IL App (1st) 122917-U (unpublished order under Supreme Court Rule 23).

¶ 12    Upon remand to the trial court, Mr. Evans' postconviction counsel received an affidavit from Mr. Evans' trial counsel who attested that she reached out to Mr. Weston's attorney to interview Mr. Weston, since he had pending charges in an unrelated murder case. Mr. Weston's attorney could not remember whether someone reached out to him but said he would have refused to let Mr. Weston be interviewed regardless of such a request. As such, after reviewing the petition and obtaining affidavits, Mr. Evans' postconviction counsel requested leave to amend the petition to assert a claim of actual innocence based on newly discovered evidence. Mr. Evans' counsel alleged that since Mr. Weston was previously unavailable to testify and be interviewed, his testimony constituted newly discovered evidence. The trial court denied the request to amend the postconviction petition, explaining that this court's mandate allowed for an evidentiary hearing on the issue of ineffective assistance of counsel, which was no longer viable according to Mr. Evans' postconviction counsel. The court stated that the best avenue for relief available to Mr. Evans would be to file a successive postconviction petition for the actual innocence claim. Mr. Evans' postconviction counsel withdrew the petition, and Mr. Evans filed a motion for leave to file a *pro se* successive postconviction petition alleging actual innocence. The trial court granted the motion,

appointed an attorney, and advanced the postconviction petition to third-stage proceedings. The court conducted the evidentiary hearing on November 26, 2019.

¶ 13    In the evidentiary hearing, Mr. Weston testified that he is currently serving a 75-year term of imprisonment for first-degree murder in an unrelated case. He testified that he was 16 years old on the date of the shooting and he was with Mr. Galloway and Mr. Evans "shooting dice" that day on a vacant porch on the 4700 block of West Maypole Avenue. He said he had been friends with Mr. Galloway and had known Mr. Evans for a few years. Mr. Weston claimed that while they were playing the dice game, two unknown men with hooded sweatshirts with the hoods pulled up came out of the gangway and started shooting the group on the porch. He stated that Mr. Evans and Mr. Galloway ran down the steps of the porch and headed east while he ran in the other direction. As Mr. Weston ran away, he saw a car speeding down the alley behind the building where they had been playing dice and heading in the direction that Mr. Evans and Mr. Galloway were running. He called to them to turn around and Mr. Evans did so, but he saw Mr. Galloway laying on the ground. Mr. Evans and he proceeded to run away from the scene of the crime, going west. Mr. Weston was arrested the next day, held for 72 hours, and was advised by his attorney to not speak to anyone.

¶ 14    Mr. Weston further testified that, in 2006, he wrote letters to the Cook County Public Defender's Office and the Cook County State's Attorney's office to notify them that Mr. Evans was not responsible for Mr. Galloway's murder. He explained that prior to then, he did not make any attempts to explain Mr. Evans' innocence because he had been instructed to not speak with the police and at the time feared for his life and the life of his family members if people learned that he was "working with the police." Mr. Weston stated that, in 2010, he wrote an affidavit for Mr. Evans in support of his case. He acknowledged that he also wrote affidavits for Jamal Taylor and Antoine Sangster, two other individuals convicted of murder in unrelated cases. Mr. Taylor

was convicted of killing someone in November or December 2003, within approximately a month of Mr. Galloway's murder. In Mr. Weston's affidavit regarding Mr. Taylor, he attested that Mr. Taylor was not present during the murder. At the time of the murder, he did not speak to law enforcement about it. In 2015, he wrote the affidavit or letter of support for Mr. Sangster. In that document, he stated that he witnessed the murder, for which Mr. Sangster was convicted, and that Mr. Sangster to his knowledge was not present. He stated that two other people killed the victim in that case.

¶ 15    The trial court gave an oral ruling regarding Mr. Evans' postconviction claim. In its ruling, the court stated that, as a fact finder, "one has to consider all the circumstances of the testimony, whether it's contradicted, the value of the witnesses and the demeanor, use common sense, [and] experiences in life" when coming to decisions of credibility. The court stated that, "while making a judgment of the credibility of [Mr.] Weston after having heard and considered all the things that [the court] just went through and personally observing him testify before [it,] perhaps it's one of the easier decisions that this court has ever had to make." The court found Mr. Weston's testimony lacked credibility and "[Mr. Weston's] demeanor [was] taken into consideration." While recognizing that some individuals do not cooperate with law enforcement out of fear of retaliation, the court questioned whether that same risk existed here if Mr. Weston was trying to get an innocent man out of custody by saying the shooter was not Mr. Evans but two unknown males, whom he could not identify by name.

¶ 16    The trial court also drew attention to Mr. Weston writing multiple affidavits for individuals convicted of murder. The court reasoned that it was unlikely that Mr. Weston witnessed three murders in which law enforcement convicted the wrong individual. The trial court suggested that he was being compensated to give false testimony. The court stated that "[Mr. Weston's]

- 8 -

credibility was nonexistent and based on the new evidence there is nothing at all that would be in any way remotely close to being conclusive that it might very well change the results of the original trial." The court ruled that there was not "any reasonable probability that the outcome would have been different," and as such, denied the successive postconviction petition. On November 26, 2019, after the court's ruling, Mr. Evans filed his notice of appeal.

¶ 17                                   ANALYSIS

¶ 18    We note that we have jurisdiction to consider this matter, as Mr. Evans filed a timely notice of appeal. See Ill. S. Ct. R. 606, 651(a) (eff. July 1, 2017).

¶ 19    Mr. Evans argues on appeal that the trial court erred by denying the successive postconviction petition because Mr. Weston's testimony offered conclusive evidence that would have likely changed the result in a new trial. Specifically, he claims that Mr. Weston's testimony that he was not the shooter contradicts the other testimony against him, and with that testimony it was probable that he would have been found not guilty. As such, the trial court should not have denied his postconviction petition and should have granted a new trial.

¶ 20    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a criminal defendant with a mechanism, where he or she can argue that his or her sentence and conviction were the result of a substantial denial of his or her constitutional rights under the United States Constitution, Illinois Constitution, or both. *People v. English*, 2013 IL 112890, ¶ 21. A postconviction proceeding is not an appeal from the judgment, but rather, it is a collateral attack on the trial court proceedings. *English*, 2013 IL 112890, ¶ 21. To receive postconviction relief, a defendant must show a substantial deprivation of his or her federal or state constitutional rights in the trial court proceedings, which produced the challenged judgment. *English*, 2013 IL 112890, ¶ 21.

¶ 21　A postconviction proceeding operates in three stages. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). If a defendant's postconviction petition survives the first stage, the proceedings advance to a second stage where counsel is appointed and granted leave to amend the petition into an appropriate legal form. *People v. Turner*, 187 Ill. 2d 406, 416-17 (1999). If the petition makes a substantial showing of a constitutional violation, the matter advances to the third stage, which is an evidentiary hearing to determine the validity of the petition's factual allegations. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). We will not reverse a trial court's decisions regarding credibility determinations or fact-finding after a third-stage evidentiary hearing unless it is manifestly erroneous. *Pendleton*, 223 Ill. 2d at 473.

¶ 22　A defendant can raise a claim of actual innocence under the Act. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Procedurally, claims of actual innocence are handled the same as any other postconviction petition under the Act. *Washington*, 171 Ill. 2d at 489. Substantively, a claim of actual innocence warrants a new trial if it is supported by evidence that is: (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *Washington*, 171 Ill. 2d at 489.

¶ 23　Looking at the first prong, regarding whether Mr. Evans' claim is supported by evidence that is newly discovered, the State argues that Mr. Weston's testimony is not newly discovered evidence. In support of its argument, it states that Mr. Weston's testimony or the substance of it was known to Mr. Evans at the time of his trial. Evidence is considered "newly discovered," when it "has been discovered since the trial and that the defendant could not have discovered [it] sooner through due diligence." *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009).

¶ 24　However, the State's argument, while it is established law in certain circumstances, does not recognize the reality of the situation in this case. Mr. Weston was arrested shortly after the

shooting because the police assumed that he was involved in the murder based on the statements of other witnesses. At the police station, his attorney stated that Mr. Weston was invoking his right to remain silent and would not give a statement to the police. Consequently, Mr. Evans' attorney could only speculate what Mr. Weston's testimony would have been if he was called to testify, assuming that he would not invoke his Fifth Amendment right regarding the incident. While it is unclear whether Mr. Evans' attorney reached out to Mr. Weston's attorney during the pendency of Mr. Weston's murder case, it is undisputed that Mr. Weston's attorney *would have declined any request to interview his client*. These circumstances lead us to find that Mr. Weston was unavailable at the time of Mr. Evans' trial, making his testimony newly discovered evidence. See *People v. Edwards*, 2012 IL 111711, ¶ 38 (stating no amount of due diligence can force a codefendant to testify, and therefore, a codefendant may be unavailable, despite a defendant's knowledge of the codefendant's potential testimony). As such, we must examine the second prong of the three- prong test to determine whether the testimony is material and not cumulative.

¶ 25    There is no dispute among the parties as to the impact of this prong. Clearly, if Mr. Weston's testimony is taken at face value, it offers a different narrative of the events that occurred on the day of the murder. Therefore, it would not be cumulative. See *People v. Lofton*, 2011 IL App (1st) 100118, ¶ 38 ("Evidence is considered cumulative when it does not add anything to what was previously before the jury."). Further, Mr. Weston's testimony is evidence that would be produced for the purpose of exonerating Mr. Evans. Thus, it was clearly material.

¶ 26    The third prong and the last determination under that test is that we must determine whether Mr. Weston's testimony was of such a conclusive character that it would probably change the result of the trial. At this stage, "the new evidence need not necessarily establish the defendant's innocence; [but] rather, a new trial is warranted if all of the facts and surrounding circumstances,

including the new evidence, warrant closer scrutiny to determine the guilt or innocence of the defendant." *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1034 (2011). However, our review is carried out under the standard of manifest error. A trial court's denial of a postconviction petition after an evidentiary hearing will not be overturned unless the error is "clearly plain, evident, and indisputable." *Gonzalez*, 407 Ill. App. 3d at 1034.

¶ 27    "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL 118674, ¶ 12. The credibility of Mr. Weston was one of the most important factors in the evidentiary hearing. The trial court, as the trier of fact, was tasked with making credibility determinations. The court found Mr. Weston's testimony incredible and commented on his demeanor as well as the reasonableness of certain aspects of his testimony. Mr. Weston admitted that he also wrote affidavits or letters of exoneration for *two other individuals convicted of murder*. In those documents, he stated that the convicted individuals were innocent of the murders, just as he did for Mr. Evans. The court verbally noted the unlikely probability that Mr. Weston had personally witnessed three murders, in which individuals were wrongfully convicted. Although the court voiced a reasonable inference that Mr. Weston was compensated in some way for his affidavits, there is no indication that the court based its credibility determination on that inference. Additionally, the court questioned why Mr. Weston had waited so long to come forward with the "truth" especially because his testimony did not implicate anyone in particular. While the court's analysis of Mr. Weston's motivation to fabricate testimony cannot be confirmed with certainty, when combined with all other factors such as his demeanor during his testimony and the evidence of other similar affidavits, we cannot say that the court's ruling was manifestly erroneous. The trial

court is in the best position to judge a witness' demeanor and credibility and nothing in the record before us calls that principle into question. *See Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 28 Moreover, the trial court is not considering the evidence in a vacuum. The court had the testimony of three other occurrence witnesses, who testified that they saw Mr. Evans chasing Mr. Galloway. Two of those witnesses also stated that he was holding a firearm at the time of the shooting. Given all the testimony, we cannot say the trial court's decision was manifestly erroneous. Having considered all three prongs of the actual innocence test regarding Mr. Weston's testimony, we find that Mr. Evans' claim of actual innocence fails. Thus, the trial court properly denied his petition on that basis.

¶ 29 Alternatively, Mr. Evans asks that we grant a new evidentiary hearing in front of a different judge, on the basis that the trial court prejudged the case and testimony. Mr. Evans points to the statements of the trial court at the second stage of the proceedings where the court mentions Mr. Weston not coming forward sooner and the court's decision to conduct a hearing instead of dismissing the petition. The method of picking and choosing among the trial court's statements is cleverly designed to change the focus of its ruling. The court commented on the procedural hurdles of this case and merely mentioned that it would have been simpler, if, when Mr. Weston was arrested, he had cooperated with law enforcement and gave a statement instead of invoking what Mr. Weston described as his Fifth Amendment right, although he had not been implicated in the case. The court's statement as such did not question Mr. Weston's credibility but instead noted what would have made sense and created the least procedural issues in the case. We note also that the court commended Mr. Evans' trial attorney for her zealous advocacy in the initial trial. Regarding the court's statements about a possible remand, which Mr. Evans is now holding out as a reason for remand to a different judge, the court stated:

"In any event, the Appellate Court sent it back on one issue and the issue went away, so then a new issue comes up, as they always seem to do, and I just have to add this to the other 450 cases on my call and resolve it and I'm going to resolve it here with a hearing rather than dismissing it and have the Appellate Court send it back again. They favor hearings. The Post-Conviction Act is interpreted extraordinarily liberally. In the interest, obviously, of justice and in the interest of trying to make sure that in the event somebody is in the Illinois Department of Corrections who does not belong there and who is innocent, that they give every opportunity to show that so that an injustice can be righted."

¶ 30    We note that Mr. Evans did not include the trial court's mention of favoring hearings and giving "every opportunity to show that" a defendant who was wrongfully convicted could be heard in order to prevent an injustice. In the full context of the trial court's comments, it is clear that the court did not prejudge the matter but instead gave Mr. Evans every opportunity to fully flesh out his claim of actual innocence by granting an evidentiary hearing. Accordingly, we deny Mr. Evans' request for remand of this case to a different judge and affirm the trial court's denial of Mr. Evans' postconviction petition.

¶ 31                                            CONCLUSION

¶ 32    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 33    Affirmed.