# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Adams*, 2013 IL App (1st) 111081

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEIVANTE ADAMS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1081 |
| Filed | August 23, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of defendant's motion for leave to file a successive postconviction petition was reversed and the cause was remanded for further proceedings, since defendant presented exculpatory affidavits of three eyewitnesses of the murder of defendant's former girlfriend and at least two of the affidavits provided newly discovered evidence setting forth a colorable claim of defendant's actual innocence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CR-13790; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Deborah K. Pugh, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.

Justices Gordon and Reyes concurred in the judgment and opinion.

## OPINION

¶ 1 Defendant Leivante Adams[1] appeals from the denial of his motion to file a successive petition for postconviction relief. On appeal, defendant contends that the trial court erred in denying him leave to file because he presented a colorable claim of actual innocence based on the exculpatory affidavits of three eyewitnesses. For the reasons that follow, we reverse and remand for further proceedings.

¶ 2 Following a 2004 jury trial, defendant was found guilty of first degree murder and sentenced to 45 years in prison. On direct appeal, defendant contended that the trial court abused its discretion by admitting evidence of a prior crime, and that the State failed to prove him guilty beyond a reasonable doubt. We affirmed defendant's conviction and sentence. *People v. Adams*, No. 1-05-0908 (2006) (unpublished order under Supreme Court Rule 23). In the course of doing so, we set forth the underlying facts of the case. Those facts will be repeated here to some extent due to the nature of defendant's postconviction claims.

¶ 3 Prior to trial, the court granted the State's motion to present evidence of a March 20, 2003, domestic battery involving defendant and the victim, Raama Baker. Defendant had pleaded guilty to this offense, and the order of protection referenced in the indictment was issued as a result of this incident. The court specifically admitted the evidence to demonstrate defendant's animosity toward the victim, intent to harm or kill her, and motive. The court found that the probative value of the evidence outweighed its prejudicial value. At trial, the State presented the protective order to the jury.

¶ 4 Larry Lewis, the victim's boyfriend, testified with regard to the domestic battery. He testified that on March 20, 2003, he was at a lounge with the victim. About 8:30 p.m., he learned that the victim and defendant were outside fighting. When he went outside, he saw defendant punching the victim in the face and broke up the fight. He then drove the victim

---

[1]We note that the record includes several spellings of defendant's first name, including Leivaunte, Lei'vaunté, and Leivaunde.

to his uncle's house and called the police. The victim sustained a swollen eye, which he identified in a photograph at trial.

¶ 5      Bonnie Baker McCain, the victim's mother, testified that the victim and defendant had been in a relationship a couple of years prior to her murder on May 15, 2003, and that they had a daughter together. About 11:30 p.m. on May 15, 2003, Bonnie received a phone call from Larry Lewis. Larry informed her that the victim had been attacked and was in the hospital. At the hospital, Bonnie learned that the victim's arm had been broken and that her skull had been "bashed in." She died the following day. Dr. Kendall Crowns, who performed the autopsy on the victim, testified that she died as a result of homicidal assault injuries consistent with being hit with a blunt object and from falling to the ground.

¶ 6      Terrence Whisby, defendant's brother, testified that on May 15, 2003, he, his brother Anthony Oliver, and his girlfriend, Kim Washington, were living with his mother, Barbara Oliver, in Chicago. They were all home that night watching a basketball game. Defendant and Toni Washington, the mother of defendant's child, were visiting. About 11 p.m., Whisby answered the doorbell, saw the victim walk by the house, and then returned to his bedroom. About 20 minutes later, he heard arguing and went outside where he saw defendant on the porch and the victim on the sidewalk. Defendant approached the victim and they walked down the street together, yelling all the while. Defendant and the victim then started to "tussle," and the victim fell to the ground. After noticing that defendant had a stick in his hand, Terrence ran toward defendant, who was "constantly" hitting the victim with the stick, and pulled defendant away from her. The victim was lying on the ground motionless, and blood was on the ground and on her face. After defendant dropped the stick, Terrence retrieved it, took it home, washed it off, and gave it to Toni Washington. Defendant did not return home that night.

¶ 7      Terrence acknowledged giving three different statements to the police between 10 a.m. on May 17, 2003, and 9:40 p.m. on May 19, 2003, while he was being held at the police station. In his final statement, Terrence substantially corroborated his trial testimony, except for his statement that defendant hit the victim with a bat. When he testified before the grand jury on June 5, 2003, he stated that defendant had a bat in his hands when he left the house. He further testified that no threats or promises were made in exchange for his statement, contrary to his testimony at trial, where he stated that the police threatened that he would not be allowed to leave until he gave a signed statement. The assistant State's Attorney (ASA) who presented Terrence to the grand jury verified his grand jury testimony at trial.

¶ 8      Anthony Oliver, another brother of defendant, testified that about 11 p.m. on the night in question, defendant left the house, then returned, saying that the victim "shouldn't be walking down the block." Defendant's mother went outside and told Anthony to call the police. Anthony complied, telling them that there was a fight in the alley. Anthony did not see defendant again that night, but the following day, he spoke to defendant on the telephone, although he could not recall their conversation.

¶ 9      On May 21, 2003, however, Anthony testified before the grand jury that when defendant called, he asked if the police had been asking questions. Defendant told Anthony that he "snapped and started hitting [the victim] with the bat" because he warned her not to walk

down his street anymore, and because she called him a "bitch" and said she would walk anywhere she wanted. Anthony further testified that when he looked outside, he saw the victim's body lying on the ground, then saw defendant pull away in a car. The ASA who presented Anthony to the grand jury verified his grand jury testimony at trial.

¶ 10    Kim Washington, Terrence's girlfriend, testified that she was outside and saw the victim walk down the street. Defendant, who was also outside, gave the victim "a warning," then followed her with a bat in his hand. Kim went back into the house to get shoes for defendant's mother, heard a "thump," then saw the victim lying on the ground. Defendant was standing next to the victim with the bat in his hands. When Terrence grabbed defendant, defendant dropped the bat. Terrence picked it up and brought it inside the house.

¶ 11    On June 6, 2003, Kim testified before the grand jury that defendant came in the house and said that the victim was not supposed to be on the block, then grabbed a bat from the doorway. She then saw the victim lying on the ground and watched defendant hit her two or three times with the bat. The ASA who presented Kim to the grand jury verified her grand jury testimony at trial.

¶ 12    Barbara Oliver, defendant's mother, testified that about 11 p.m. on the night in question, defendant entered her bedroom and told her that the victim was on the block and was going to call the police and attempt to have him arrested. Barbara told defendant to leave the house, and defendant got in his car and left.

¶ 13    However, on June 5, 2003, Barbara testified before the grand jury that when the victim walked down the block, she was standing on the porch and told the victim that she was not supposed to be there. Defendant, who was in his car with Toni Washington, got out of the car, entered the doorway to the house, and then left immediately. Barbara asked Kim Washington, who was on the porch with her, to get her shoes. Then Barbara heard noises, like someone was being hit with a bat. Barbara walked down the street and saw the bloodied victim lying on the ground. Terrence, who had also been outside, grabbed defendant, and Barbara told defendant to leave. Defendant drove away in his car, but called her later that night to apologize. Barbara further testified that no promises or threats were made in exchange for her testimony. The ASA who presented Barbara to the grand jury verified Barbara's grand jury testimony at trial.

¶ 14    Toni Washington, the mother of defendant's son, testified that on the night in question, she and defendant went out to his car to talk. At that time, they saw the victim walk by the house. Defendant got out of the car, talked to the victim in front of the house, and then walked down the street with her. After that, defendant drove away in his car and Toni drove home in her car. Toni returned to the house minutes later to return a camcorder, at which time Terrence gave her defendant's gym bag. The bag contained a black garbage bag, which she threw away without looking inside it.

¶ 15    On May 27, 2003, Toni testified before the grand jury that after defendant left the house, he returned to retrieve a bat. Defendant walked down the street with the victim, carrying the bat in his hand. When they reached an alley, he warned the victim that she was not supposed to be on the block. They started to walk away from each other, but then defendant turned around and hit the victim with the bat. Toni approached as defendant hit the victim with the

bat six to seven times. Terrence retrieved the bat, brought it back to the house, washed it off, and put it in a black bag. Toni left for about five minutes. When she returned, Anthony gave her a black gym bag, which contained the bat. Toni drove back to her apartment and threw the bag into a Dumpster outside of her complex.

¶ 16    Toni further testified that no promises or threats were made in exchange for her testimony, contrary to her statement at trial that the police had promised not to charge her with anything and had said she could see her son again if she cooperated. The ASA who interviewed Toni and presented her to the grand jury, testified that Toni's grand jury testimony was not coerced. In addition, Toni's attorney, Steven Weinberg, testified that he accompanied Toni when she testified before the grand jury, and that prior to her testimony, the State's Attorney did not threaten her, nor did Toni complain that she was mistreated by the police. Weinberg further testified that he made an agreement with the State's Attorney that if Toni told the truth, she would not be charged with hiding the murder weapon.

¶ 17    In his own defense, defendant testified that he had slept with the victim in 2001, but he denied having a relationship or a child with her. He did admit, however, to occasionally seeing her after their affair in the neighborhood or at the lounge. On March 20, 2003, he went to the lounge and asked the victim, who was there, if she would step outside to talk to him about problems she was having with his mother and his brother, Terrence. They eventually began hitting each other, but the fight was broken up. Defendant went to his mother's house, and shortly thereafter, the victim and her boyfriend drove up and "slammed" into his mother's rental car. Defendant eventually turned himself in and pleaded guilty to domestic battery.

¶ 18    Defendant testified that on the night in question, he was watching a basketball game at his mother's house. Afterwards, he and Toni Washington walked out to his car, which was parked across the street, to discuss their son. They saw the victim walk by, then slow down to "have words" with his mother and his brother Terrence, who were standing on the porch. Defendant approached the victim and they walked south together, discussing the problems she was having with Terrence and defendant's mother. When they reached a vacant lot, defendant turned around and walked back to the house. Defendant's mother told defendant and Toni to leave, and they did. Defendant denied that he had a baseball bat, hit the victim with a bat, or that he murdered her. No other evidence was presented by the defense.

¶ 19    The jury found defendant guilty of first degree murder. The trial court entered judgment on the verdict. The court subsequently found defendant death-penalty eligible, but sentenced him to 45 years' imprisonment in light of the mitigating evidence presented.

¶ 20    In 2007, following our decision on direct appeal, defendant filed a *pro se* postconviction petition alleging, among other things, that his trial counsel was ineffective for failing to move to dismiss his indictment due to a speedy trial violation or to preserve the issue for appellate review by raising it in a posttrial motion. Shortly thereafter, defendant filed a supplemental *pro se* postconviction petition raising multiple claims of prosecutorial misconduct, ineffective assistance of trial and appellate counsel, and judicial bias. The trial court summarily dismissed both the initial petition and the supplemental petition. Defendant appealed, contending that he had set forth the gist of a claim of ineffective assistance of trial

counsel based on counsel's omissions with regard to speedy trial violations. We affirmed the trial court's judgment. *People v. Adams*, No. 1-07-3215 (2009) (unpublished order under Supreme Court Rule 23).

¶ 21    In 2010, defendant filed a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)). The trial court dismissed the petition *sua sponte*. On appeal, we affirmed, but directed the clerk of the circuit court to correct the mittimus to reflect the appropriate amount of presentence custody credit. *People v. Adams*, 2011 IL App (1st) 101034-U.

¶ 22    In November 2011, defendant moved for leave to file a successive petition for postconviction relief, arguing that the State failed to disclose both that his car was examined for forensic evidence and the results of that testing. Defendant also argued that his trial counsel was ineffective for failing to obtain the results of the State's forensic testing and for failing to hire experts to conduct their own forensic examination of the car. The trial court denied leave to file. We granted appellate counsel's motion to withdraw as counsel and affirmed the judgment of the circuit court. *People v. Adams*, 2013 IL App (1st) 120213-U.

¶ 23    In February 2011, defendant filed the instant motion for leave to file a successive postconviction petition, in which he alleged actual innocence based on newly discovered evidence in the form of affidavits of three potential witnesses identifying someone else as the victim's murderer. Defendant asserted that his supporting affidavits "would appear to be 'newly discovered' evidence that was not available to the petitioner at the time of the trial, or when petitioner filed his initial petition for post-conviction relief." He stated, "In addition, the evidence could not have been discovered by the petitioner sooner through due diligence, and the affidavits are material and non-cumulative and are of such conclusive character that had the jury known of this evidence, this would probably change the result on retrial." Defendant further asserted that the affidavits could not have been discovered sooner through due diligence "due to his incarceration." In support of his petition, defendant attached affidavits executed by Muhammad Williams, Brigette Rush, and Tijatta Williams.

¶ 24    In his affidavit, dated September 1, 2010, Muhammad Williams stated that between 11 p.m. and 12 a.m. on the night in question, he was driving past the scene of the crime when he saw four or five people in the middle of the street. As he got closer, he saw "a man about 6'0"–6'1" in height, light brown complexion, with braids, beating someone on the ground with a baseball bat." Muhammad quickly turned down an alley and went home. He learned the next day that someone had been killed at the location where he witnessed the beating, but did not call the police. He explained that he did not feel he could have been of any help because he did not know the perpetrator. According to Muhammad's affidavit, months later, he found out defendant had been arrested for the murder. He did not know defendant "personally" but "did know of him" because he had seen defendant playing basketball at a park. Muhammad averred that the man he saw commit murder "was definitely not" defendant. Muhammad stated that he moved to California for a few years, and when he moved back to Chicago, he found out defendant was in prison for the murder he had witnessed. He still did not go to the police because he thought he could get into trouble for not contacting them earlier. Muhammad stated that he was coming forward now because he knew defendant was innocent and his conscience had been weighing on him.

-6-

¶ 25    In an affidavit dated September 14, 2010, Brigette Rush averred that on the night in question, she went to defendant's mother's home to get information about a job. Defendant's mother, Anthony Oliver, Kim Washington, and Terrence Whisby were in the house; defendant and Toni Washington were sitting in defendant's car. While Brigette was writing down details about the job, someone began arguing outside of the house. Brigette saw defendant's mother go outside and heard her tell defendant to leave. Brigette stepped out onto the porch and saw defendant get into his car and drive off. Terrence and the victim were in the middle of the street, arguing. Defendant's mother repeatedly told Terrence to come inside, but he refused. The victim started walking down the street and Terrence followed her. At this point, Brigette saw "Mike, Dominick and several other men who were friends of Terrence" standing near the alley. Mike, who had a bat in his hands, walked up to the victim and hit her over the head. The victim fell to the ground and Mike repeatedly hit her with the bat. Then Mike dropped the bat, and he and "the other guys" ran from the scene. Terrence picked the bat up from the ground and ran into the house with it. Brigette went into the house to get her keys and purse. Terrence grabbed her by the throat, put a gun to her head, and said, "Keep your mouth shut or the same thing will happen to you." After Terrence let go of her neck, Brigette left immediately.

¶ 26    Brigette stated that Chicago police detectives contacted her about the murder and that defendant and "several people involved in his case" asked her to come forth and tell what she witnessed. However, due to Terrence's threat and out of fear for her own and her children's lives, she refused to cooperate with the police or get involved. Brigette stated, "Despite still being afraid and fearful of Terrence and his friends I've decided to come forward and tell what happened because it's the right thing to do."

¶ 27    Tijatta Williams, in an affidavit dated December 7, 2010, stated that on the night in question, she was walking past the scene of the crime and saw a crowd of people in the middle of the street near the alley. She saw "Mike" walk up to a woman and strike her over the head with a bat. The woman fell and Mike struck her several more times. When the crowd began to disperse, Tijatta left the area. Tijatta stated that she did not report what she saw to the police because she was scared of being killed by Mike if she did so. She also stated that she did not see defendant at the scene on the night of the beating. At an unspecified time, she ran into defendant's sons and their mother at a mall, felt bad for them, and felt compelled to tell about the incident that put defendant in prison.

¶ 28    The trial court denied defendant's motion to file a successive postconviction petition.

¶ 29    On appeal, defendant contends that the trial court erred in denying him leave to file because he presented a colorable claim of actual innocence based on the exculpatory affidavits of Muhammad Williams, Brigette Rush, and Tijatta Williams, who all attested that they saw someone other than defendant commit the murder of which he was convicted. Noting that his conviction was based solely on the testimony of eyewitnesses, defendant argues that the affiants' potential testimony would have cast strong doubt on his guilt by identifying a different perpetrator. Defendant asserts that the affidavits presented newly discovered, material, non-cumulative evidence that would most likely change the result on retrial.

¶ 30    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2010)) contemplates the filing of only one postconviction proceeding. *People v. Edwards*, 2012 IL 111711, ¶ 22. However, our supreme court has provided two bases upon which the bar against successive proceedings may be relaxed. *Id*. The first basis is when a defendant establishes "cause and prejudice" for failing to raise the claim earlier. *Id*. The second is the "fundamental miscarriage of justice" exception, under which the defendant must show actual innocence. *Id*. ¶ 23. When a defendant claims actual innocence, the question is whether his motion and supporting documentation set forth a colorable claim; that is, whether they raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id*. ¶¶ 24, 31, 33. The evidence supporting the claim of actual innocence must be (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *Id*. ¶ 32. We review the denial of leave to file a successive petition *de novo*. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 31    As to the first element, evidence is considered "newly discovered" if it has been discovered since trial and if the defendant could not have discovered it sooner through due diligence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009). Defendant asserts that the affidavits of Muhammad Williams, Brigette Rush, and Tijatta Williams constitute newly discovered evidence because they could not have been discovered prior to trial. He argues that because he left the scene of the crime before it occurred, he would not have known that these witnesses happened to be present at the time of the offense, and that he had no way of knowing what these eyewitnesses had seen until they voluntarily came forward long after the crime had occurred. The State maintains that while the affidavits may have been executed by new sources, they do not present any new facts that were unknown to defendant prior to trial. With regard to Brigette Rush, the State further argues that defendant knew about her at the time of his trial, as evidenced by her statement that defendant had asked her to come forth but she refused to get involved. Defendant counters that Brigette's lack of cooperation indicates that he was not privy to her knowledge of the crime.

¶ 32    We first address the affidavits provided by Muhammad Williams and Tijatta Williams. Because Brigette Rush, unlike Muhammad and Tijatta, averred that she was known to defendant prior to trial, we will consider her affidavit separately.

¶ 33    Taking the information contained in Muhammad's and Tijatta's affidavits as true, the circumstance that they each passed by the scene of the crime and witnessed someone other than defendant committing the murder was not discovered until years after the offense, when they came forward and signed their affidavits in 2010. Prior to Muhammad and Tijatta coming forward, defendant would not have had any reason to seek them out. According to defendant's trial testimony, he was not at the scene at the time the victim was beaten. Therefore, he would not have known Muhammad and Tijatta had happened to pass by and witness the crime. Further, nothing indicates that either of these witnesses spoke with defendant or the police about what they observed. In these circumstances, we find that the evidence was discovered since trial and could not have been discovered earlier through due diligence.

¶ 34    The second requirement for a successful claim of actual innocence is that the newly

discovered supporting evidence be material and not merely cumulative. Evidence is deemed cumulative if it does not add anything to what was previously before the jury. *Ortiz*, 235 Ill. 2d at 335. Evidence is not cumulative if it would create new questions in the mind of the trier of fact. *People v. Williams*, 392 Ill. App. 3d 359, 369 (2009).

¶ 35     Here, viewing the facts alleged in Muhammad's and Tijatta's affidavits as true, evidence that someone other than defendant killed the victim and that defendant was not present at the scene is certainly material. See *People v. Lofton*, 2011 IL App (1st) 100118, ¶ 38. Both affidavits concern the ultimate issue of whether defendant was the person who beat the victim to death. The affidavits would also add to what was previously before the jury in that the jury had heard defendant's testimony that he left the scene before the victim was killed, but had heard no evidence pointing to the identity of an alternate perpetrator. Muhammad's and Tijatta's attestations exonerating defendant are sufficient to create a new question of defendant's innocence in the eyes of the jury. See *Williams*, 392 Ill. App. 3d at 370. Thus, defendant has made a showing that the evidence contained in Muhammad's and Tijatta's affidavits is material and not merely cumulative.

¶ 36     The third and final requirement is that the evidence must be so conclusive that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32. Evidence of actual innocence must support total vindication or exoneration, not merely present a reasonable doubt. *Lofton*, 2011 IL App (1st) 100118, ¶ 40; *People v. Green*, 2012 IL App (4th) 101034, ¶ 36. Where the statement of a witness is both exonerating and contradicts a State witness, it can be capable of producing a different outcome on retrial. *Ortiz*, 235 Ill. 2d at 336-37.

¶ 37     In the instant case, defendant testified at trial that he walked and talked with the victim, but left the area before she was beaten. Both Muhammad and Tijatta corroborate this version of events, which would exonerate defendant. Muhammad stated that the man he saw commit murder was not defendant and offered a physical description of the perpetrator. Tijatta identified the murderer as "Mike," and even stated that she did not see defendant at the scene. The evidence offered by Muhammad and Tijatta would be capable of changing the result on retrial because, where there was no physical evidence implicating defendant and defendant did not confess, the evidence of defendant's innocence would be stronger when weighed against the contradictory testimony given by the State's eyewitnesses. See *Ortiz*, 235 Ill. 2d at 337.

¶ 38     The State maintains that defendant's supporting affidavits would not probably change the result on retrial because they contradicted his own trial testimony. Specifically, the State notes that defendant testified that he walked and talked with the victim, but left the area before she was beaten, and that Muhammad and Tijatta attested that they passed by the murder scene, but "contrary to defendant's testimony, neither of these affiants saw defendant on the street that night." We disagree with the State that a contradiction exists. According to defendant's testimony, he left the scene before the victim was beaten. Muhammad and Tijatta averred that they passed by the scene during the beating. Taking the statements as true, Muhammad and Tijatta could have arrived at the scene after defendant left. The State's argument is unpersuasive.

¶ 39     Having determined that Muhammad's and Tijatta's affidavits provide newly discovered

evidence, we need not resolve the question of whether Brigette's affidavit, by itself, constitutes newly discovered evidence. Defendant has set forth a colorable claim of actual innocence based on two of the attached affidavits. That is, defendant's successive postconviction petition has raised the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence, if credible. See *Edwards*, 2012 IL 111711, ¶ 24. Accordingly, the trial court erred in denying leave to file the successive petition. We reverse and remand for further postconviction proceedings.

¶ 40       For the reasons explained above, we reverse the judgment of the circuit court of Cook County.

¶ 41       Reversed and remanded.