2020 IL App (1st) 171200-U

THIRD DIVISION
September 30, 2020

No. 1-17-1200

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 6983 |
| | ) | |
| DANIEL RODRIGUEZ, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Denial of defendant's motion for leave to file a successive postconviction petition reversed and remanded for further proceedings where defendant presented a colorable claim of actual innocence.

¶ 2    Defendant, Daniel Rodriguez, was convicted of first-degree murder and sentenced to 45 years' imprisonment in connection with the July 26, 2003 stabbing death of the victim, Alberto Marinez. This appeal arises from the circuit court's denial of his motion for leave to file a successive postconviction petition.

¶ 3    The evidence elicited at trial was set out extensively in the Rule 23 order filed in defendant's direct appeal.  We will summarize that evidence below to the extent relevant to this appeal.

¶ 4    The evidence at trial established that on July 26, 2003, at approximately 3:00 a.m., multiple Chicago police personnel were assigned to investigate a homicide outside a restaurant known as "Raymond's Tacos" at 2653 West Cermak Street. The body of the victim was found at that location with multiple stab wounds. The parties stipulated that the medical examiner would testify that the cause of death was multiple stab wounds and the manner of death was homicide.

¶ 5    Also at approximately 3:00 a.m. on July 26, 2003, Chicago police officers were following a grey Chevy Lumina that traveled at a "high rate of speed" through a stop sign at the intersection of 22nd Place and California Street. As the officers prepared to "head off" the vehicle, the driver jumped out and fled on foot, and the car crashed into a fence. One officer pursued the driver of the vehicle but ultimately lost sight of him. The three other suspects in the vehicle were detained, and they included two male suspects, Carlos Estrada and Andreas Bahena (also known as Antonio Abarca) (hereinafter "Abarca"), and a female suspect, Anali DeLeon. After speaking to the three suspects, a detective issued an investigative alert for "Daniel Rodriguez." Defendant was eventually arrested on February 16, 2005.

¶ 6    Estrada, who had pled guilty to the second-degree murder of the victim and was serving a sentence of 20 years' imprisonment, testified at defendant's trial, and his videotaped statement made on July 27, 2003, was entered into evidence.

¶ 7    In the videotaped statement, Estrada was advised of his rights, and thereafter told investigators that in the early morning hours of July 26, 2003, Estrada was robbed by a man after Estrada left a party. After the robbery, Estrada got into his car and went to get his "brother Daniel

2

Rodriguez," who he identified in a photograph. Estrada told defendant about the robbery, and defendant became upset and asked Estrada if he wanted to find the person who had robbed him. Estrada stated that he did and then he and defendant, along with defendant's girlfriend and Abarca, entered Estrada's car. Estrada drove while defendant sat in the front passenger seat and the others sat in the rear.

¶ 8     As they were driving, defendant saw the victim near Raymond's Taco Restaurant and asked Estrada if that was the person who robbed him. Estrada responded affirmatively, and he and defendant then exited the vehicle and approached the victim. As he got out of the car, Estrada grabbed his "club," which he used to lock the steering wheel of the car, from the rear floor of the car.

¶ 9     Estrada saw defendant hitting the victim in the stomach and Estrada began to hit the victim in the shoulders with the club. Estrada then noticed that the victim had blood on his hands, that defendant had a knife, and that the victim did not have a weapon in his hands. Estrada returned to his vehicle carrying the club and got into the driver's seat while defendant got into the front passenger seat. Estrada drove down Washtenaw Street to 22nd Place and, after Estrada almost collided with another car, defendant told Estrada that he would drive. Estrada and defendant switched places and defendant drove down 22nd Place and turned into an alley when they were approached by a police car. Defendant jumped out of the car while it was still moving and ran away, and the car crashed into a fence.

¶ 10    Near the conclusion of the videotaped statement, Estrada stated that he had been treated "okay" by the detectives and the assistant state's attorney (ASA), that he had eaten, and that he had been allowed to use the restroom. Estrada also stated that he was not under the influence of

drugs or alcohol and that no threats or promises had been made to him in order to obtain his statement.

¶ 11    At defendant's trial, Estrada essentially recanted the above videotaped statement. Estrada testified that during the early morning hours of July 26, 2003, Estrada was robbed by three men, one of whom was the victim. Estrada then testified that he did not remember anything that happened after the robbery because he was "very drunk." Estrada did not remember if he went to get defendant after the robbery, if he saw defendant punching the victim while holding a knife in his hands, or if he gave a videotaped statement. Estrada did not remember being arrested at 3:00 a.m. on July 26, 2003, but he did remember that he was "captured" by the police and that the police "beat [him] up" at the police station. Before Estrada spoke to an ASA and a detective, the police hit him in order to "tell [him] what to say" and the ASA told him he was going to be charged with first-degree murder. Estrada testified that he lied in his videotaped statement because the police had accused him of stabbing the victim and he was worried he would get "in a lot of trouble for that." Estrada did not try to correct the false statement, because his attorney told him the statement could be used to convince someone that he committed only second-degree murder. Estrada explained that he "came up" with the story because he was the only person being charged with the crime and was therefore willing "to say whatever [he] needed to say in order to get the deal."

¶ 12    During his testimony at defendant's trial, Estrada described the relevant events in a variety of ways. He testified that defendant was not his brother and that he had never seen defendant before, but later stated that he knew defendant from "the street." Estrada then acknowledged that he lied on direct appeal when he said he did not remember what happened during the murder, and he thought he could get through his testimony by claiming that he did not remember what happened. Estrada then testified that he, Estrada, was the one who actually robbed and stabbed the

victim. Estrada further testified that he joined a gang prior to his incarceration, that Abarca was also a member of that gang, and that people in that gang would be upset if he talked about someone else in the gang having committed a crime. Finally, Estrada testified that the police did not tell him to name defendant as the person who stabbed the victim, that the police simply told him to name someone else as having stabbed the victim, and that it was his idea to name defendant as that person.

¶ 13    The court found defendant guilty of first-degree murder and sentenced him to 45 years' imprisonment. The court noted that the Estrada gave a "pretty detailed account of what happen[ed]" in his videotaped statement, and concluded that Estrada was not "smart enough to make up" that account.

¶ 14    On direct appeal, defendant argued that the State failed to prove him guilty beyond a reasonable doubt and that trial counsel was ineffective for eliciting damaging identification evidence during his cross-examination of Estrada. This Court affirmed, finding the evidence was sufficient to prove defendant's guilt and the testimony defense counsel elicited on cross did not impact the outcome of the trial. *People v. Rodriguez*, No. 1-06-3525 (June 27, 2008) (unpublished pursuant to Rule 23).

¶ 15    Thereafter, in January 2010, defendant filed a *pro se* petition for postconviction relief. In that petition, defendant alleged, among other things, that his trial counsel was ineffective for failing to investigate and present various alibi witnesses. In support, defendant attached unsigned "affidavits" attributed to six named witnesses, asserting that defendant had been living with them in Mexico on July 26, 2003. Defendant also included his own signed statement, which explained that, due to the circumstances of his incarceration, he had limited phone contact with an individual who had contact with the witnesses in Mexico, and that defendant had been unable tell the

witnesses where to mail their signed affidavits. On March 5, 2010, the court dismissed defendant's petition as frivolous and patently without merit, on the basis that the purported witness statements were not affidavits "in compliance with the postconviction act." This Court affirmed the summary dismissal of defendant's post-conviction petition. *People v. Rodriguez*, 2011 IL App (1st) 100945-U.

¶ 16    On August 3, 2011, while the first post-conviction appeal was pending, defendant filed a *pro se* motion for leave to file a successive postconviction petition alleging actual innocence, ineffective assistance of counsel, and a due process violation based on the State's knowing use of perjured testimony to secure his conviction. The motion purported to attach an affidavit from Abarca, however, there was no affidavit attached to the petition. The trial court denied defendant leave to file a successive petition, and this court granted counsel's *Finley* motion to withdraw from the appeal of that order and affirmed the judgment below. *People v. Rodriguez*, 2013 IL App (1st) 113200-U.

¶ 17    In November 2011, defendant filed a second *pro se* motion for leave to file a successive postconviction petition. Defendant alleged that he was actually innocent based on the "voluntary declaration" of Abarca. Defendant attached an unnotarized "voluntary declaration" of Abarca, in which Abarca stated generally that that on July 26, 2003, he was a passenger in a car with Estrada; DeLeon; and Estrada's brother, Daniel "Dreamer" Estrada ("Dreamer"). Estrada further stated that it was Estrada and Dreamer who exited the car at Raymond's Tacos and Estrada returned with a bloody knife. Abarca stated that it was Dreamer who was driving the car and fled from police.

¶ 18    Abarca further stated that he was not cooperative at the police station, so the police physically abused him. Eventually, the police showed him a picture of the person DeLeon "said did it," so Abarca agreed to identify that person.  Later, the police told him that they had "picked

up the guy from the picture," and they knew he "wasn't the one that did it." The police then showed Abarca a statement that DeLeon signed and showed him pictures of defendant, who Abarca stated that he knew from the neighborhood. The police threatened to charge Abarca with murder if he did not agree with DeLeon's story that defendant did it. According to Abarca, the police "said that [defendant] was a piece of s***" who they suspected of "committing another previous gang murder," and that they had "been wanting to get him off the streets." Due to the threats and the physical abuse, Abarca agreed to implicate defendant.

¶ 19    Abarca stated, however, that "[o]ver the last couple of years of [his] incarceration," Abarca had been trying to "get closer to God by reading the bible," and wanted to tell the truth. Abarca reiterated that defendant was not in the car with him, Estrada, Dreamer, and DeLeon. Abarca stated that he would have been willing to testify at trial to these facts if only a lawyer had contacted him, and that he would still be willing to so testify.

¶ 20    On December 2, 2011, the circuit court denied defendant leave to file his second successive petition, noting that Abarca's non-notarized "voluntary declaration" was not an affidavit within the meaning of the Post-Conviction Act. Defendant did not appeal that denial.

¶ 21    Thereafter, on June 20, 2012, defendant filed a third *pro se* motion for leave to file a successive post-conviction petition, which is the subject of the instant appeal. As grounds for relief, defendant claimed that he is actually innocent based on newly discovered evidence. In support, defendant attached a notarized affidavit of Abarca. Defendant asserted various difficulties in locating and obtaining an affidavit from Abarca, who was "in the federal prison system." Defendant stated that prison rules prohibited defendant from communicating with Abarca without the warden's permission, which he sought to no avail. Additionally, defendant maintained that the

7

Illinois Department of Corrections (IDOC) had provided him with inadequate forms, and denied him the services of a notary.

¶ 22 In Abarca's affidavit, he averred to substantially the same sequence of events described in his "voluntary declaration" submitted as part of defendant's second *pro se* petition for leave to file a successive post-conviction petition. Abarca, however, added that when Estrada pulled the car up to Raymond's Tacos, Estrada told Dreamer "let's go talk to [the victim]." Estrada and Dreamer got out of the car, and Abarca drove to a nearby parking lot and then walked back toward Estrada, Dreamer and the victim. Abarca saw the victim holding a knife. Estrada told Dreamer to hit the victim and Dreamer complied. The victim dropped the knife, and Estrada grabbed it and stabbed the victim. Abarca stated that he could not stop any of this because he did not know it was going to happen and he did not want Estrada or the victim to kill him. When he returned to the car, Estrada was holding the bloody knife. Estrada told DeLeon he would kill her if she told, and instructed Abarca to get in the car. Abarca got in because he was scared Estrada would kill him. Estrada initially drove, but then pulled over and told Dreamer to drive. Estrada wiped off the bloody knife and threw it out the window. After they were blocked in by the police in the alley, and Dreamer got out and ran away, Estrada told Abarca and DeLeon not to tell the police anything. Abarca stated that Estrada was a "gang Chief" and Estrada's family could have easily murdered Abarca's family in Mexico. Abarca did not tell the police any of this because he did not want to get charged with murder or put himself or his family in danger.

¶ 23 Defendant also attached his own notarized affidavit, in which he averred to a telephone conversation he had with DeLeon, in which she stated that the police coerced her into identifying another individual, and thereafter, defendant, after it was determined that the first man was not

8

involved. DeLeon also related to defendant that Estrada is a "powerful gang member" who threatened to kill her if she talked, and that he was capable of having her family in Mexico killed.

¶ 24    In addition to his claim of actual innocence, defendant also raised claims that the State committed a *Brady* violation by failing to disclose evidence that Abarca and DeLeon initially identified a different person as the assailant, and evidence that the police used improperly coercive tactics. Defendant also contended that he received ineffective assistance of trial counsel where, among other things, counsel did not sufficiently investigate Abarca as an eyewitness.

¶ 25    Thereafter, defendant filed supplements to his petition on September 6, 2013, December 18, 2013, and May 9, 2014. Among other claims, defendant reiterated his claim of actual innocence and presented two signed and notarized affidavits from Jorge Flores and Jose Salinas.

¶ 26    Flores averred that he saw Estrada stab someone in front of Raymond's Tacos and Flores did not see defendant anywhere in the area at the time of the murder. The man who was with Estrada at the time showed up at Flores's house later that day and told Flores not to say anything. Flores had since learned that defendant was convicted of the murder that he saw Estrada commit, and Flores knew that defendant was not involved in the crime. Flores stated that he would be willing to testify to the above, and he did not come forward sooner because he was afraid Estrada would kill him.

¶ 27    Salinas averred that he was present for the murder of the victim on July 26, 2003. Salinas saw Dreamer hit the victim with an object and saw Estrada stab the victim. Dreamer later showed up at Salinas's house with some of the "Insane Deuces" from Aurora and threatened to kill Salinas if he said anything. Salinas further averred that he did not see defendant anywhere in the area on the night of the victim's murder. Salinas stated that he did not come forward with this information

9

sooner because Dreamer threatened him and because he knew Estrada would have gotten his fellow gang members to kill Salinas or his family.

¶ 28    On February 11, 2016, counsel entered an appearance on behalf of defendant. Defendant, through counsel, filed another supplement to his petition on December 6, 2016, expanding on the claims in defendant's earlier *pro se* filings. Defense counsel also attached police records showing that on July 26, 2003, police initially arrested a different individual, who was also named David Rodriguez, based on DeLeon's identification of him as the victim's assailant, but the police ended up releasing that individual without any charges.

¶ 29    On March 9, 2017, the circuit court ruled on defendant's motion for leave to file a successive post-conviction petition without argument from the parties. The court found that Abarca's affidavit was not newly discovered evidence where he was listed in the police reports and his testimony could have been obtained sooner through due diligence. The court further found that Abarca's testimony was not so conclusive that it would have changed the result on retrial where, had he testified, he would have been impeached by his previous statements to police naming defendant as the person who stabbed the victim. The court also pointed out that the affidavit was internally inconsistent where Abarca stated he would not tell police what really happened because he feared Estrada, but also stated that he would have been willing to testify had he been contacted to do so.

¶ 30    The circuit court further found that the affidavits of Flores and Salinas were not material to defendant's guilt or innocence because they only indicated they did not see defendant at the scene, which did not rule out his involvement. The court additionally found the proposed testimony was not so conclusive as to probably change the result on retrial where they provided only vague

observations, or generalized information, about the events, which did not outweigh the evidence presented at trial.

¶ 31     With regard to the *Brady* violation, the circuit court found that defendant's claim that the police withheld Abarca's and DeLeon's initial statements and identifications of someone else was not exculpatory or impeaching, and defendant's claim was unsupported and conclusory. Finally, the court found defendant's claim of ineffective assistance of trial counsel meritless where there was no basis for counsel to believe that Abarca had any relevant information that would aid in defendant's defense when he named defendant as the perpetrator in his statements to police, and even if counsel's performance was deficient, Abarca's testimony would not have changed the outcome of the trial.

¶ 32     Accordingly, the circuit court concluded that defendant failed to raise a cognizable claim of actual innocence, or to satisfy the cause and prejudice test necessary to advance his claims.  The court denied defendant leave to file his successive post-conviction petition.

¶ 33     Defendant filed a motion to reconsider on April 7, 2017, which was denied on April 26, 2017. Defendant filed a timely notice of appeal from that denial.

¶ 34     In this appeal, defendant argues that he made a colorable claim of actual innocence, and asks this court to reverse the denial of his motion for leave to file a successive petition and remand for second stage proceedings. We initially note that by limiting his challenge to his actual innocence claim, defendant forfeited review of the remaining claims in his petition. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *People v. Guest*, 166 Ill. 2d 381, 414 (1995); *People v. Enis*, 194 Ill. 2d 361, 376 (2000) (a reviewing court will "consider only those claims that defendant raised on appeal").

¶ 35　The Post-Conviction Hearing Act (Act) allows a defendant who is imprisoned in a penitentiary to challenge his conviction or sentence on the grounds that it was the result of a denial of his constitutional rights. 725 ILCS 5/122-1 (West 2016); see also *People v. Robinson*, 2020 IL 123849, ¶ 42 ("The Act provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial."). The Act ordinarily contemplates the filing of a single postconviction petition (*id.*) and a defendant must obtain leave of court before filing a successive petition (725 ILCS 5/122-1(f) (West 2018)). A court should grant leave where a defendant can show either (1) cause and prejudice for failure to raise the claim earlier, or (2) a "fundamental miscarriage of justice" based on actual innocence. *Robinson*, 2020 IL 123849, ¶ 42; *People v. Edwards*, 2012 IL 111711, ¶¶ 22-23. We review *de novo* a trial court's denial of leave to file a successive postconviction petition. *People v. Bailey*, 2017 IL 121450, ¶ 15.

¶ 36　Here, defendant maintains that leave should have been granted based on his actual innocence claim. A request for leave to file a successive petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. *Robinson*, 2020 IL 123849, ¶ 44. Accordingly, leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. *Id.* The determination of whether a postconviction petition sets forth a colorable claim of actual innocence is a question of law that we review *de novo. Id*. ¶ 40.

¶ 37　At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true, and the court is precluded from making factual and credibility determinations, which can

"be made only at a third-stage evidentiary hearing." *Id.* ¶¶ 45, 61. Moreover, evidence is not "positively rebutted simply because it was contradicted by the evidence presented at trial." *Id.* ¶ 60. "For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible ***." *Id.*

¶ 38     The supreme court recently explained the standard for actual innocence claims in *Robinson*, 2020 IL 123849, ¶¶ 47-48, as follows:

> "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. [Citations.] Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citation.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. [Citation.] The conclusive character of the new evidence is the most important element of an actual innocence claim. [Citation.]
>
> Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder

would reach a different result after considering the prior evidence along with the new evidence. [Citation.]"

¶ 39    In this case, defendant contends that he presented a colorable claim of actual innocence based on the affidavits of Abarca, Salinas, and Flores. Those affiants generally aver that they were present for the murder of the victim, that defendant was not present, and that Dreamer was the second perpetrator along with Estrada. The affiants also aver to their prior unwillingness to come forward with this information in light of threats by Estrada and/or Dreamer, and fear that they or their families would be killed if they did so. Abarca also avers that his identification of defendant was procured by threats, physical abuse, and coercion by the police.

¶ 40    The proposed testimony of Abarca, Salinas, and Flores is material, where all three averred that they were eyewitnesses to the victim's stabbing, that it was Estrada and Dreamer who participated in the murder, and that defendant was not present. See *People v. Coleman*, 2013 IL 113307, ¶ 103 (testimony that witnesses were "present for or involved in the attack" and "that the defendant was not" is "relevant, and probative of the defendant's innocence."); *People v. Adams*, 2013 IL App (1st) 111081, ¶ 35 ("viewing the facts alleged in [the] affidavits as true, evidence that someone other than defendant killed the victim and that defendant was not present at the scene is certainly material"). Moreover, the proposed testimony is not cumulative to any evidence presented at defendant's bench trial, as it contradicts the videotaped statement of Estrada and implicates an alternative perpetrator in the murder of the victim. See *People v. Ortiz*, 235 Ill. 2d 319, 335-336 (2009) (where "testimony supplied a first-person account of the incident that directly contradicted the prior statements of the two eyewitnesses for the prosecution," it "added to what was before the fact finder" and was "not merely cumulative."); *Adams*, 2013 IL App (1st) 111081, ¶ 35 (affidavits pointing to the identity of an alternate perpetrator for the first time would "add to

what was previously before the jury."). Accordingly, the proposed testimony here is noncumulative, and would add to the information that the jury heard at defendant's trial.

¶ 41 Assuming the truth of all well-pleaded allegations in the petition and supporting affidavits not positively rebutted by the trial record, as we must do at this stage in proceedings, we also conclude that the proposed testimony would probably change the result on retrial. To be of such a conclusive character, the evidence supporting a postconviction petition need not be entirely dispositive to probably change the result on retrial. *Robinson,* 2020 IL 123849, ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* If a trier of fact on a retrial believed the testimony that defendant was not present at the murder, and that it was Estrada and Dreamer who perpetrated the crime, that testimony would be dispositive, as Estrada was the only eyewitness at defendant's trial that linked him to murder. There was no other eyewitness testimony or physical evidence connecting the defendant to the crime.

¶ 42 Finally, the proposed testimony of Salinas and Flores meets the standard for newly discovered evidence because both witnesses indicated in their affidavits that they did not come forward sooner due to their fears of Estrada. Furthermore, neither was listed by either side as a possible witness at the time of trial. Thus, there is no basis for concluding that defendant could have discovered their exculpatory testimony sooner through due diligence. See *Adams*, 2013 IL App (1st) 111081, ¶ 24, 27, 33 (eyewitness evidence was newly discovered where the witnesses' proposed testimony identifying a different perpetrator "was not discovered until years after the offense, when they came forward and signed their affidavits.").

¶ 43 Abarca, however, was arrested near the scene of the crime and listed as a possible trial witness by both the prosecution and defense. Accordingly, the State contends that defendant

15

cannot show that Abarca's testimony could not have been discovered sooner through due diligence. Defendant, on the other hand, contends that he carefully detailed the various obstacles that prevented him from investigating the substance of Abarca's observations in his petition, and further argues that he should not be denied relief where it was his trial counsel who did not attempt to contact Abarca. Nevertheless, this court need not determine whether Abarca's testimony is newly discovered, since the affidavits of Salinas and Flores alone are sufficient to require remand for second stage proceedings.

¶ 44    For the reasons stated, we reverse the circuit court of Cook County's denial of the defendant's motion for leave to file a successive postconviction petition alleging actual innocence and remand the case for second stage proceedings.

¶ 45    Reversed and remanded.