2020 IL App (1st) 180299-U

No. 1-18-0299

December 9, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 22391 |
| | ) | |
| ANTONIO PARKER, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Denial of leave to file successive postconviction petition reversed where defendant made colorable claim of actual innocence.

¶ 2     Following a jury trial, defendant Antonio Parker was found guilty of first degree murder and sentenced to 55 years' imprisonment. In this appeal, defendant contends the circuit court erred in denying him leave to file a successive postconviction petition alleging actual innocence, based

on the affidavit of an eyewitness who attests defendant did not commit the murder and identified the perpetrator. We reverse and remand.

¶ 3 Defendant was charged with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2002)), which alleged he, without lawful justification, intentionally, knowingly, or knowing that such action created a strong probability of death or great bodily harm, shot and killed Eddie Thomas by personally discharging a firearm that proximately caused death.

¶ 4 At trial, Yvette Broughton testified she was walking down the stairway of her apartment building on North Burling Street (the Burling building) at approximately 2:30 a.m. or 2:45 a.m. on September 17, 2002, when she stopped on the eighth floor because she heard "at least about three" voices arguing in the hallway below. She looked down the stairwell and saw defendant, whom she identified in court, and the shoes of a second person. Defendant held a pistol at the side of his leg. Broughton heard defendant say, "I want my money," then heard two gunshots and saw a "sparkle" from where defendant was standing. She ran to the first floor and outside the building and, 10 to 15 minutes later, went back inside and up to the seventh floor. She saw Thomas lying "back, head up, feet on the stairs" and blood splattered all over the ground.

¶ 5 Broughton was interviewed by an assistant State's Attorney (ASA) on December 14, 2004. She acknowledged telling the ASA she saw defendant point the gun at Thomas's face, heard a gunshot, saw Thomas's body fall to the ground, ran away, and then heard a second gunshot.

¶ 6 Broughton testified before the grand jury on December 15, 2004. She acknowledged testifying she saw Thomas and defendant two to three feet apart from each other, and heard defendant say, "[S]top lying, or I'm going to shoot you in your face." She told the grand jury she heard another voice, which she did not recognize, say, "[W]ait a minute. Put something over it so

they won't hear the shot." She also testified before the grand jury she saw defendant aim the gun at Thomas's mouth and shoot him.

¶ 7    On cross-examination, Broughton testified she did not know where the "other people" on the stairway were. She could not see the faces of any of the people involved in the shooting, including the face of the person who shot Thomas. She had not heard defendant's voice in at least six years at the time of the shooting.

¶ 8    Royce Hatter testified he goes by the nicknames "Little Rico" and "Rico." At approximately 2:30 a.m. on September 17, 2002, he was drinking in the Burling building with defendant, whom he identified in court, "Night Fall," "L-Dog," and "Wheezy." Defendant and "L-Dog" left for a few minutes and returned with Thomas. Hatter heard defendant and Thomas talking loudly, followed by the sound of "scuffling." He saw defendant and Thomas "tussling" and grabbing each other for a few seconds. Defendant and Thomas punched each other and moved into the corner of the building. Hatter saw defendant push Thomas down the stairs, and Thomas fell onto a landing between the fifth and sixth floors.

¶ 9    Hatter, "Night Fall," "L-Dog," and "Wheezy" went to that landing and kicked Thomas for a minute or less. Defendant came to the landing, reached into his waist, pulled out a gun, and pointed it at Thomas's face from two to three feet away. Hatter saw defendant fire the gun, and then Hatter ran up to the fifteenth floor. He saw defendant, "L-Dog," and "Wheezy" on the fifteenth floor and heard three more gunshots. Hatter ran out of the building and drove to his girlfriend's house.

¶ 10    On cross-examination, Hatter testified defendant and "L-Dog" were behind him when he ran to the fifteenth floor after defendant shot Thomas. He heard three additional gunshots as he ran up the stairs.

¶ 11    Erica Coleman testified that, between 10:00 p.m. and 11:00 p.m. on September 16, 2002, she looked out her window and into an apartment in the neighboring Burling building. She saw defendant, Thomas, and "L-Dog" in the Burling building apartment. Between 1:00 a.m. and 2:00 a.m. on September 17, 2002, Coleman's boyfriend went downstairs and yelled Thomas's name. "[R]ight after that," Coleman heard one or two gunshots. She looked out her window and saw defendant, "L-Dog," and "La-Rico" on the fourteenth floor of the Burling building. She also saw "Nightfall" "[i]n the back of the building."

¶ 12    On cross-examination, Coleman testified she did not see defendant holding a gun when she saw him through the window between 9:00 p.m. and 10:00 p.m. on September 16, 2002. Five to six minutes after she heard the gunshots, she saw defendant and his girlfriend run out of the Burling building.

¶ 13    Senecca Williams testified he saw defendant, whom he identified in court, and a man by the nickname "Maniac" arguing one evening a "couple months" before defendant's arrest in 2007. Williams heard defendant say to "Maniac," "[K]eep on playing with me, I do you like I done Little Eddie."[1]

¶ 14    Williams also testified he had a pending narcotics case in federal court. He denied his pending case had any connection to his testimony in this case.

---

[1] "Little Eddie" was Thomas's nickname.

¶ 15    On cross-examination, Williams testified he was on bond and awaiting sentencing in his federal case. He was "getting a deal" in his federal case because he "testified against people" concerning drug dealing near the Burling building. He spoke to "cold case" investigators about Thomas's murder and "told them what [he] kn[e]w," but he denied he agreed to testify in this case.

¶ 16    Chief medical examiner Nancy Jones testified she performed Thomas's autopsy. The court qualified her as an expert in the field of forensic pathology. Jones observed an entrance gunshot wound above the right side of Thomas's upper lip, and a through and through gunshot wound to Thomas's right shin.

¶ 17    Illinois State Police forensic scientist Aaron Horn testified he examined two fired bullets and five fired cartridge cases in connection with this case, but did not receive a gun to analyze. On cross-examination, Horn testified the cartridge cases were not submitted for fingerprint analysis.

¶ 18    Chicago police detective Thomas Johnson testified he and his partner arrested defendant, whom he identified in court, on October 9, 2007.

¶ 19    The jury found defendant guilty of first degree murder and that, during commission of the offense, he personally discharged a firearm causing death. Defendant was sentenced to 55 years' imprisonment.

¶ 20    On direct appeal, defendant challenged the sufficiency of the evidence, the effectiveness of his trial counsel, and the State's remarks during closing argument. We affirmed his conviction. *People v. Parker*, 2012 IL App (1st) 100478-U. Defendant filed an initial postconviction petition arguing, *inter alia*, the State committed a *Brady* violation by withholding Williams's address, because that prevented his trial counsel from identifying "Maniac." The circuit court summarily dismissed defendant's initial postconviction petition, and we affirmed, granting appointed counsel

leave to withdraw. *People v. Parker*, No. 1-14-1367 (December 14, 2015) (unpublished summary order under Illinois Supreme Court Rule 23).

¶ 21    Defendant filed a motion for leave to file a second postconviction petition, in which he raised a claim of actual innocence based on the affidavit of Henry "Maniac" Myles. In the affidavit, Myles attests he witnessed a man named Terry "EBT" McNeal shoot Thomas in the face. Myles was present "in a hallway" at noon on September 17, 2002, when McNeal, "Rio," and Williams beat Thomas "trying to get money" he owed. When Thomas did not have the money, McNeal shot him.

¶ 22    Myles attests he did have a conversation with defendant and Williams in 2007, but defendant did not threaten to kill him or reference killing Thomas. Williams admitted to Myles he testified falsely in this case to help himself in a federal criminal case. Myles states Williams conspired with other witnesses to frame defendant. Finally, Myles attests he did not come forward with this information earlier because McNeal threatened to kill him, but McNeal is now deceased, so Myles is no longer scared to identify him as Thomas's killer. Myles states he is coming forward of his own free will and, if called, will testify truthfully to the best of his recollection.

¶ 23    The circuit court denied defendant leave to file his successive postconviction petition, finding Myles's affidavit was not likely to change the result on retrial.

¶ 24    Defendant was granted leave to file a late notice of appeal.

¶ 25    On appeal, defendant contends the circuit court should have granted him leave to file a successive postconviction petition because Myles's affidavit raises a colorable claim of actual innocence.

¶ 26    The Post-Conviction Hearing Act (725 ILCS 5/121-1 *et seq.* (West 2016)) provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated at trial. *People v. Dupree*, 2018 IL 122307, ¶ 28. The Act contemplates only one postconviction proceeding per defendant. 725 ILCS 5/122-1(f) (West 2016); *People v. Robinson*, 2020 IL 123849, ¶ 42. However, a defendant may bring a successive postconviction petition where, as relevant here, he asserts a fundamental miscarriage of justice based on actual innocence. *Robinson*, 2020 IL 123849, ¶ 42.

¶ 27    "Prior to commencing a successive postconviction petition, a petitioner must obtain leave of court." *Id.*, ¶ 43. "A request to file a successive petition based on actual innocence is reviewed under a higher standard than that applicable to the first stage for an initial petition, which only requires that the petition is not frivolous or patently without merit." *Id.* "A request for leave to file a successive petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Id.*, ¶ 44. "Accordingly,  leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.*

¶ 28    "At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id.*, ¶ 45. "In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.*

¶ 29    "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would

probably change the result on retrial."[2] *Id.*, ¶ 47. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* It "refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.*, ¶ 48. "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* We review the denial of leave to file a successive postconviction petition *de novo*. *Id.*, ¶ 40.

¶ 30    We find defendant has set forth a colorable claim of actual innocence, and the circuit court's denial of leave to file a successive postconviction petition was in error. At this stage, we must take Myles's affidavit as true. See *Id.*, ¶ 45. That eyewitness affidavit states defendant was not the shooter, and identifies the actual shooter as Terry "EBT" McNeal. It also rebuts Williams's claim defendant referenced murdering Thomas during an argument with Myles in 2007, and it offers an explanation for why Myles did not come forward with this information sooner. Where newly discovered evidence is exonerating and contradicts a State's witness, it is capable of producing a different outcome on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009); see also *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36; *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49. That is the case with Myles's affidavit because it directly contradicts the testimony of three State's witnesses: Broughton, Hatter, and Williams, and it affirmatively states defendant did not murder Thomas. Thus, "the evidence of defendant's innocence would be stronger when weighed

---

[2] The State does not dispute Myles's affidavit is newly discovered, material, and noncumulative. It only contests the "conclusive character" element.

against the contradictory testimony given by the State's eyewitnesses." *Adams*, 2013 IL App (1st) 111081, ¶ 37 (citing *Ortiz*, 235 Ill. 2d at 337).

¶ 31 Moreover, Myles's testimony would place the trial as a whole in a different light. See *Robinson*, 2020 IL 123849, ¶ 48. No physical evidence linked defendant to Thomas's murder. The State's evidence he committed the murder came through two eyewitnesses to the crime, Broughton and Hatter, as well as Williams, who claimed defendant referenced killing Thomas approximately five years after the fact. Defendant originally attempted to hold the State to its burden of proof by cross-examining these witnesses, but did not present any evidence of his own. However, on retrial, the case would become a credibility contest between Myles on the one hand and the State's witnesses on the other.

¶ 32 Such a change in the character of the trial raises the probability the fact finder would reach a different result. See *Id.* "The fact finder will be charged with determining the credibility of the witnesses in light of the newly discovered evidence and with balancing the conflicting eyewitness accounts." *Ortiz*, 235 Ill. 2d at 337. " '[T]his does not mean that [defendant] is innocent, merely that all of the facts and surrounding circumstances, including the testimony of [defendant's witness], should be scrutinized more closely to determine the guilt or innocence of [defendant].' " *Id.* (quoting *People v. Molstad*, 101 Ill. 2d 128, 136 (1984)). Accordingly, defendant should have been granted leave to file his successive postconviction petition.

¶ 33 The State's arguments to the contrary are unpersuasive. The State contends we cannot consider Myles's claim Williams admitted to testifying falsely because that statement is hearsay. This is incorrect; the rules of evidence do not apply to postconviction proceedings. Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019); *Robinson*, 2020 IL 123849, ¶¶ 78-80.

¶ 34    The State also notes that Myles's affidavit incorrectly claims the shooting occurred at noon. The fact that Myles's affidavit places the shooting approximately nine hours after it occurred does not negate the significance of his eyewitness testimony defendant did not commit the murder. Rather, the time discrepancy is a matter of Myles's credibility, which we do not evaluate at this stage of postconviction proceedings. See *Robinson*, 2020 IL 123849, ¶ 45.

¶ 35    Similarly, the fact that the State's witnesses did not report seeing Myles or McNeal at the scene is also an issue of Myles's credibility, because it concerns whether other witnesses corroborate Myles's account of the shooting. See *In re Alba*, 185 Ill. App. 3d 286, 290 (1989) (corroboration adds weight or credibility to evidence). These issues do not negate the relevant allegations of Myles's affidavit, which are that McNeal murdered Thomas, and defendant never said he killed Thomas.

¶ 36    The remainder of the parties' arguments address whether Broughton and Hatter's accounts were consistent with each other and "the medical and firearms evidence in the case," and whether they had reasons to testify untruthfully. These are matters of Broughton and Hatter's credibility, and they do not change the essential allegations of Myles's affidavit. Accordingly, we find defendant has stated a colorable claim of actual innocence, and the denial of his motion for leave to file a successive postconviction petition was in error.

¶ 37    For the foregoing reasons, we reverse the circuit court's denial of leave to file a successive postconviction petition and remand this matter for appointment of counsel and second-stage proceedings.

¶ 38    Reversed, cause remanded.